UNITED STATES of America

v.

Martin W. PEARLSTEIN a/k/a Martin Williams, Frank A. Trombetta a/k/a Frank Anthony, Gerald Segal, Sigmund Traister, Albert Hurwitz, and Benjamin Hannig.

Gerald Segal, appellant in No. 77–1381

Sigmund Traister, appellant in No. 77–1382

Benjamin Hannig, appellant in No. 77–1383

Nos. 77–1381 to 77–1383.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1977.

Decided April 21, 1978.

Joshua Friedman, Taenzer & Friedman, P. C., Cinnaminson, N. J., for appellant Gerald Segal.

Howard Ross Cabot, Cherry Hill, N. J., for appellant Sigmund Traister.

J. Llewellyn Mathews, Apell, Forman & Howard, P. C., Browns Mills, N. J., for appellant Benjamin Hannig.

Jonathan L. Goldstein, U. S. Atty., by Ralph A. Jacobs, Asst. U. S. Atty., Newark, N. J., for appellee.

Before ADAMS and GARTH, Circuit Judges, and LAYTON, Senior District Judge.[*]

## OPINION OF THE COURT

LAYTON, Senior District Judge:

Appellants were convicted of mail fraud under 18 U.S.C. § 1341.[1] The primary issue raised by each defendant in this consolidated appeal is whether there was sufficient evidence adduced at their joint trial to sustain the jury's verdicts against them. Because we conclude that there was not, we reverse.

Appellants Segal, Traister and Hannig were indicted along with three others for conspiracy and mail fraud. Count I of the thirty-four count indictment alleged that the six defendants, and a seventh unindicted confederate, conspired to use the mails for the purpose of executing a scheme to defraud. The allegedly fraudulent scheme involved the sale of distributorships for a direct-mail-marketing pen company organized by defendants Pearlstein and Trombetta, and by the unindicted co-conspirator, Gabriel Rudolph. Defendants Segal, Traister, Hurwitz and Hannig were salesmen employed by the pen company. Eighteen of the substantive mail fraud counts charged the defendant-salesmen, together with Pearlstein and Trombetta, with specified uses of the mails in furtherance of the fraudulent scheme. Only one salesman was charged per count, although each salesman was charged in several counts. The remaining fifteen substantive counts charged only Pearlstein and Trombetta. Each of the thirty-three substantive mail fraud counts was based upon a particular mailing to one of thirty-five allegedly-defrauded victims of the scheme.

Trombetta died prior to trial. Both Pearlstein and Hurwitz pleaded guilty to a reduced number of counts. A motion for separate trials was denied and the joint trial of the remaining defendants, Segal, Traister and Hannig, commenced on January 3, 1977, before the United States District Court for the District of New Jersey. Upon defense motions at the close of the Government's case, the trial court dismissed the conspiracy charge but refused to enter judgments of acquittal on the substantive mail fraud counts, and also denied a renewed severance motion. The case finally went to the jury on January 28 and three days later the verdicts were returned. Segal was convicted on two of the three remaining counts in which was charged; Traister on two of four; Hannig on two of three. The trial court denied defendants' renewed motions for judgments of acquittal and also refused to order new trials. Each appellant has been fined and sentenced to a term of imprisonment.

---

[*] Senior United States District Judge for the District of Delaware, sitting by designation.

1. In pertinent part, the federal mail fraud statute provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (1976).

Although they challenge their convictions on numerous grounds, we find it necessary to treat only the primary issue raised by the appellants: whether the evidence presented at their trial was sufficient to support their convictions under 18 U.S.C. § 1341.

I

■ The scope of the federal mail fraud statute is quite broad. It generally proscribes any "scheme or artifice to defraud" which in some way involves the use of the postal system.[2] The essential elements of an offense under § 1341 are 1) the existence of a scheme to defraud; 2) the use of the mails in furtherance of the fraudulent scheme; and 3) culpable participation by the defendant. *E. g., United States v. Tiche*, 424 F.Supp. 996, 1001 (W.D.Pa.), *aff'd mem.*, 564 F.2d 90 (3d Cir. 1977).

We carefully have reviewed the evidence in this case to determine whether each of those elements was established adequately with respect to each defendant. In so doing, we have been mindful that as an appellate tribunal we must view the evidence in the light most favorable to the Government, *United States v. Crockett*, 534 F.2d 589, 598 (5th Cir. 1976); *United States v. Adamo*, 534 F.2d 31, 36 (3d Cir. 1976), and must indulge all reasonable inferences in favor of sustaining the jury's verdicts. *United States v. Caine*, 441 F.2d 454, 457 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971). Viewing the record from this perspective, we must determine whether there is substantial evidence to support the convictions before us. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). *Accord, United States v. Netterville*, 553 F.2d 903, 909 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). The trial court record in this case is far too lengthy to permit its detailed analysis here but we will discuss briefly the salient features of the alleged fraudulent scheme and each defendant's participation therein.

## THE G. MARTIN FRANK, LTD./ELGIN PEN SCHEME

In the fall of 1969, Pearlstein, Trombetta and Rudolph were working as salesmen for Nelson James, Ltd., a California company involved in the direct mail marketing of pens. Impressed with the apparent success of their employers, the three salesmen decided to start their own pen company. As a result, G. Martin Frank, Ltd., was incorporated in New Jersey in February, 1970.

G. Martin Frank (GMF) was created as a virtual carbon copy of Nelson James. Writing instruments were sold to businesses through local distributorships, or franchises, under the label "Elgin Pen." The three GMF principals recruited and trained distributorship salesmen, and provided them with leads developed through newspaper advertisements. Using a sales kit prepared by the principals, the salesmen contacted prospects around the country, gave a standard sales pitch also developed by the principals, and signed persons to affiliate distributorship agreements. As part of these agreements, distributors purchased mailing lists from GMF, the size of which determined the commissions earned by the salesmen. GMF purchased the mailing lists from two national marketing research firms for about one-tenth the price it charged the distributors. In addition to the mailing lists, distributors received Elgin Pen promotional material, sample pens and order forms. They earned commissions on pen orders placed with GMF through mass mailing solicitations which they prepared using the mailing lists and other materials. GMF handled the actual sale and distribution of the pens and contracted with several companies for their manufacture under private labelling arrangements.

G. Martin Frank, Ltd., was notably unsuccessful. Although 141 persons invested almost a quarter of a million dollars in Elgin Pen distributorships, only $20,000 in pen orders were generated through the mass mailings and just $4600 in commissions were paid to distributors. Not one distributor came within $1000 of recouping

---

2. *See generally* Comment, *Survey of the Law of Mail Fraud*, 1975 U.Ill.L.F. 237.

his investment. In contrast, the GMF principals were able to draw substantial salaries and maintain healthy expense accounts despite the serious financial difficulties in which the company found itself. In August, 1971, the last Elgin Pen distributorship was sold and a few months later, G. Martin Frank, Ltd., was forced into bankruptcy by its creditors.

In determining whether the GMF/Elgin Pen operation was fraudulent in nature, there are no hard and fast rules of law to apply. The "scheme to defraud" element of the offense of mail fraud under § 1341 is not defined according to any technical standards. *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973), *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). The scheme need not be fraudulent on its face, *id.*, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. *United States v. New South Farm & Home Co.*, 241 U.S. 64, 71, 36 S.Ct. 505, 60 L.Ed. 890 (1916); *United States v. Serlin*, 538 F.2d 737, 743–44 (7th Cir. 1976); *Fabian v. United States*, 358 F.2d 187, 193 (8th Cir.), *cert. denied*, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); *United States v. Bruce, supra* at 1229; *United States v. Schall*, 371 F.Supp. 912, 916 (W.D.Pa.1974), *aff'd mem., Appeal of Nikolich*, 503 F.2d 1400 (3d Cir.), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1432, 43 L.Ed.2d 676 (1975). Furthermore, the term "scheme to defraud" connotes some form of planning or pattern. *Fabian v. United States, supra* at 192–93.

Throughout his testimony, Pearlstein maintained that G. Martin Frank, Ltd., was started as a legitimate enterprise and that it was only after the business began to sour financially that the GMF principals employed misrepresentations and deceptive practices in an attempt to salvage it. Although we do not view this question as without doubt, we conclude that there was ample evidence presented here from which the jury properly could have concluded that the GMF/Elgin Pen operation was fraudulently conceived.

Before any distributorship salesmen were hired, and occasionally thereafter, the GMF principals themselves contacted prospective distributors and made sales presentations. When they did so, Pearlstein and Trombetta used assumed names and presented Elgin Pen business cards which identified them as Martin Williams and Frank Anthony, respectively. These pseudonyms were also used by Pearlstein and Trombetta on GMF correspondence and in telephone conversations with Elgin Pen distributors. The use of aliases is circumstantial evidence of conscious deception. *United States v. Cohen*, 516 F.2d 1358, 1367 (8th Cir. 1975).

The use of fictitious names was not confined to Pearlstein and Trombetta. The GMF newspaper advertisement informed readers that interested, sincere and qualified persons were to write to "R. E. Bradley, Director, Public Relations." Those who responded to the ad received a packet of Elgin Pen promotional materials, including a "Recipe for Success" brochure, and a cover letter, both signed by R. E. Bradley. The GMF credentials sheet listed Russell E. Bradley as the vice president for public relations and gave a detailed professional background for him, including "fifteen years in managing industrial business advertising." In fact, Russell E. Bradley was Trombetta's son-in-law and at no time was a corporate officer or employee of G. Martin Frank, Ltd. The office manager, as well as the GMF principals, forged Bradley's signature on company correspondence and used his name on Elgin Pen brochures and in other promotional material. Furthermore, David Eldridge, president of the advertising agency retained by GMF, was listed falsely in the credentials sheet as Elgin Pen's marketing vice president, while Rudolph, one of the three incorporators of G. Martin Frank, Ltd., and the corporate officer actually responsible for advertising, was deliberately omitted from the list. Such a pattern of misrepresentations regarding the management of GMF/Elgin Pen, in conjunction with the continued use of aliases by its corporate officers, indicates

that the enterprise was fraudulently conceived.

■ There also was significant evidence that GMF was operated in a deceitful manner. Although the first Elgin Pen distributorship was purchased in May, 1970, it was not until August of that year that the first pen order was placed, and by the end of the summer GMF was receiving complaints from its distributors about overdue materials. An office policy was established by the GMF principals to deal with such complaints: secretaries were instructed to calm down irate callers and put them off with various excuses, none of which had any basis in fact. The actual cause of the shipping delays was GMF's lack of capital: the principals had to await income from distributorship sales before ordering mailing lists, pens and other supplies. The complaints continued unabated into the fall of 1970 and eventually GMF sent letters to all Elgin Pen distributors, blaming the delay on a wildcat strike at the factory and promising shipment by late September. This excuse was a complete fabrication, as were all of the earlier ones, and their use as a lulling technique is a further indication of the fraudulent nature of the entire GMF/Elgin Pen operation. *See United States v. Netterville*, 553 F.2d 903, 910 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

The most crucial evidence of the fraudulent nature of the overall scheme lies in the false and misleading statements included in the GMF/Elgin Pen promotional material. To begin with, virtually every item used by GMF was directly copied from Nelson James, including the pitch book, or flip chart, used by the salesmen in making their presentations.

The flip chart was an essential part of the Government's evidence in this case. It consisted of approximately twenty items which constituted the standard sales pitch used by the salesmen with prospective distributors and much of it was false or misleading. For example, a sweepstakes contest was planned by the GMF principals as an incentive to pen customers and a copy of

the sweepstakes brochure was included in the flip chart and was used by the salesmen in making their presentations. The brochure stated that "[a]ll winning numbers have already been selected by Cassidy-Richlar, Inc., an independent judging organization, by electronic computer." Pearlstein had contacted Cassidy-Richlar about conducting such a contest and a company representative had submitted a proposal and costs estimate. But no sweepstakes was ever conducted, despite the brochure's claim.

The flip chart also contained a letter, on Dun & Bradstreet stationery, purporting to be from one Walter Cleary, a district manager for that marketing research firm. The letter was directed to GMF and stated that Dun & Bradstreet had been most selective in developing mailing lists according to GMF's request, and offered a professional recommendation for Elgin Pen. Although GMF did purchase mailing lists from Dun & Bradstreet, the letter was a fake. It was dated June 10, 1969, more than six months before Pearlstein first contacted the company about buying mailing lists. Furthermore, the testimony of the regional sales manager who dealt with GMF indicated that there was no district manager named Walter Cleary; that the letter was not prepared according to the standard company format; and that such an offer of a professional recommendation specifically was prohibited by company policy. It appears that this letter also was directly copied from Nelson James and that the signature of Walter Cleary was forged.

At trial, the Government particularly stressed two items in the flip chart: the revenue projection sheet and the typical sales chart. They purported to show how much an Elgin Pen distributor could expect to earn, depending upon the amount he invested in a mailing list. Generally, the projections were based upon a one and one-half to three percent return from each mass mailing solicitation and an average pen order of $122.50. For example, if a distributor paid $1796 for a 4000-account mailing list, according to the projection sheet he

could expect to net between $634.25 and $2,537 on one mailing, and between $2,798 and $10,148 on four mailings. Applying these figures, a prospective distributor would have been led to believe that he could recoup his investment, and quite possibly make a handsome profit, within one year. In fact, no Elgin Pen distributor came close to matching these projections which, like the rest of the flip chart materials, were taken directly from the Nelson James pitch book and never were independently authenticated.

According to the direct mail marketing expert who testified at the trial, the estimated one and one-half to three percent return was very liberal; one-quarter to one-half of one percent was more in line with industry experience. Furthermore, the expert stated, the projected average pen order of $122.50 was more than twice that experienced in two other similar pen promotions. Such claims would have been the crucial, if not the only, considerations for an investor in deciding whether to buy an Elgin Pen distributorship. Where these revenue projections were used by the GMF principals with an apparent reckless disregard for their validity, such use gives rise to an inference that the principals' intent was fraudulent. *See United States v. Cohen,* 516 F.2d 1358, 1367 (8th Cir. 1975).

The flip chart contained several sample order forms for Elgin Pens. At least four of these sample orders bore 1969 dates. Since GMF did not begin functioning until February, 1970, these sample pen orders, like the Dun & Bradstreet letter, antedated the company's existence and were patently false. Even those sample orders which were dated in 1970 predated any actual pen sales.

Perhaps the most significant misrepresentations in the flip chart involved the page entitled "The Facilities where Elgin Pens are Manufactured." Immediately above this caption was a drawing of a large building, apparently a factory, on which there was a sign proclaiming it to be "Elgin/Pen." Below this drawing were nine photographs of various stages of the pen production process and of several machines and operators. These pictures were taken at the Chemolene Industries plant in Bordentown, New Jersey. GMF had contracted with Chemolene to manufacture Elgin Pens under a private labelling arrangement. Chemolene had authorized GMF to use the photographs in the Elgin Pen promotion but the drawing was used without the company's approval or knowledge. According to Pearlstein, the drawing was inserted into the flip chart to make it appear that Elgin Pen manufactured its own writing instruments, which concededly it did not do. Outright deception is therefore a reasonable interpretation of the GMF principals' intent with respect to the use of this phony drawing.

■ Such evidence of the deliberate use of false and misleading statements in the GMF/Elgin Pen promotional material, when coupled with the repeated use of aliases, fictitious names, forged signatures, fabricated excuses and "lulling" letters, was clearly sufficient to permit, if not compel, the jury here to conclude that the G. Martin Frank, Ltd., scheme was fraudulent.

## II

■ This conclusion does not end our inquiry, however, because in addition to establishing the existence of a scheme to defraud, it also was necessary that the Government prove that the defendants were a part of that scheme. Under the mail fraud statute, it must be shown that the defendants possessed the requisite intent to defraud. Proof is required of a specific intent, *United States v. Payne,* 474 F.2d 603, 604 (9th Cir. 1973), and the defendants must either have devised the fraudulent scheme themselves, *e. g., United States v. Dreer,* 457 F.2d 31, 33 (3d Cir. 1972), or have wilfully participated in it with knowledge of its fraudulent nature. *E. g., United States v. Tiche,* 424 F.Supp. 996, 1001–1002 (W.D.Pa.), *aff'd mem.,* 564 F.2d 90 (3d Cir. 1977).

In this case, it was Pearlstein, Trombetta and Rudolph, the G. Martin Frank principals, and not the defendant-salesmen, who

originated the Elgin Pen scheme and developed its fraudulent aspects. Nor is there any evidence that any of the defendants ever joined in the GMF principals' conspiracy: the trial court, in dismissing the conspiracy charge as to all defendants, found that there was insufficient evidence of an illegal agreement. In order to sustain these substantive mail fraud convictions, therefore, we must conclude that there was sufficient evidence to have permitted the jury to find that these salesmen 1) knew of the fraudulent nature of the Elgin Pen scheme, and 2) wilfully participated in it. It is with this inquiry in mind that we now briefly examine the evidence concerning the distributorship salesmen generally and each of the defendant-appellants specifically.

## THE ELGIN PEN SALESMEN

Most of the distributorship salesmen were hired upon personal recommendations either from the GMF principals or from persons known to them. There were no formal training sessions for the salesmen and what informal training there was was conducted by the three principals in the GMF office. Usually, Pearlstein and Trombetta would sit down with one or more prospective salesmen, explain the Elgin Pen concept and its promotional material, and run through a sample sales presentation. A standard sales pitch, employing the flip chart, had been developed by the GMF principals and the salesmen were expected to utilize it in making their own presentations.

After a few informal training sessions, the salesmen signed employment contracts. They were paid on a straight commission basis and were not reimbursed for their expenses. All salesmen were given a sales kit which included a flip chart, promotional materials, a sample pen display booklet and blank affiliate distributorship agreements. Leads were doled out by Trombetta and within a week of their initial interviews, the Elgin Pen distributorship salesmen were on the road.

None of the nine or ten salesmen remained with G. Martin Frank for more than a few months. All complained of too few leads, insufficient sales and tardy commission checks.

It was crucial to the Government's case to establish what the salesmen were told about the GMF/Elgin Pen operation. There was evidence that all of the salesmen should have known that the company was a fledgling enterprise, although their knowledge of precisely how new it was is not clear from the testimony. According to Pearlstein, the salesmen also knew that the revenue projections in the flip chart were "assumptions," although again it cannot be determined on this record that they knew more than that about the figures represented. The evidence is clear that each defendant relied heavily upon the Elgin Pen promotional material, particularly the flip chart, in making their sales presentations to prospective distributors.

There was no evidence, however, that these salesmen knew or should have known of several important aspects of the GMF/Elgin Pen operation. For example, there was no evidence that they knew that the flip chart drawing of the "Elgin/Pen" factory was a fake or that the sweepstakes contest was not conducted as represented in the brochure. Furthermore, there was no evidence that the distributorship salesmen were cognizant of the Nelson James origins of G. Martin Frank and the direct copying of its promotional material. The only testimony on these points was that of Pearlstein and he stated that the salesmen were never told about these features of GMF/Elgin Pen. Pearlstein testified that none of the salesmen were aware, as were the GMF principals, of the impossibility of operating Elgin Pen both profitably and legitimately.

By far the largest amount of testimony concerned the individual defendants and particularly their sales presentations. Although the evidence indicates that each salesman developed his own sales pitch, according to the testimony they generally followed the standard flip chart routine developed by the GMF principals. The testimony is also clear, however, that each defendant went beyond the basic presentation and made certain false or misleading statements to prospective Elgin Pen distributors.

## THE CASE AGAINST SEGAL

Gerald Segal had known Edward Kent, the attorney retained by GMF, for many years and according to their testimony, it was upon Kent's recommendation, and with his assurance that Elgin Pen was "clean," that Segal was referred to Trombetta as a potential distributorship salesman. Segal began working for GMF in April, 1970, and went through an informal training session with Pearlstein both before and several weeks after he went on the road.

Six Elgin Pen distributors testified against Segal and the two counts of the indictment for which he was convicted are based upon GMF transactions with two of these witnesses. From their testimony it appears that Segal closely followed the standard flip chart presentation but embellished somewhat upon it. Only one significant misrepresentation is revealed in the testimony, however: Segal's claim that he had been working for two years in a similar pen promotion in California where the distributors had done quite well. He made this false statement to one prospect.

A key misrepresentation which the Government claimed that each defendant made was that Elgin Pen in some way was connected with the Elgin Watch Company. Pearlstein testified that the salesmen specifically were told not to make such a claim. Two of the six witnesses said that Segal had mentioned Elgin Watch during a particular sales presentation but their versions of what he said were contradictory.

Segal left G. Martin Frank in July, 1970, after only ten weeks on the job. He testified that at the time he left, he felt that the company was "not too honest."

## THE CASE AGAINST TRAISTER

Sigmund Traister had known Trombetta for many years and had worked with him in New York City in 1954. Trombetta contacted Traister about coming to work for GMF and explained the Elgin Pen concept to him. Traister also knew of Kent and Eldridge and, according to their testimony, contacted them after discussing the salesman job with Trombetta. Both men highly recommended GMF and described the enterprise as a good business opportunity. Both Kent and Traister testified that Kent reiterated to Traister his belief that Elgin Pen was "clean." Traister became a distributorship salesman in late May, 1970, practiced the flip chart presentation with Trombetta, and went on the road within three days of his hiring.

Six Elgin Pen distributors testified against Traister and, as with Segal, their testimony indicated that, generally, Traister followed the standard sales presentation which Trombetta had taught him. Also like Segal, Traister added a few exaggerations and misstatements to his pitch. For example, he told one distributor that Elgin Pen was an established pen manufacturer and was expanding its production facilities by fifty percent. This of course was not true. Traister also claimed on one occasion that the marketing method employed by GMF had been tested and proven effective. He "confided" in one prospect that distributors were experiencing better percentage returns than those indicated in the projection sheet, although he also stated that the two to three percent return represented in the flip chart was more in line with GMF's expectations.

One distributor testified that Traister had claimed that there was an association between Elgin Pen and Elgin Watch, but that he had left this statement unexplained. The other witnesses said either that Traister had not mentioned Elgin Watch or that, upon questioning, he specifically had denied that there was any connection between the two companies.

After Labor Day, 1970, Traister became disgruntled with GMF and began to have misgivings about the ultimate success of the enterprise. Trombetta persuaded him to stay but in November, after six months as an Elgin Pen distributorship salesman, Traister quit.

## THE CASE AGAINST HANNIG

Despite his brief tenure with G. Martin Frank, Benjamin Hannig was the most pro-

lific Elgin Pen distributorship salesman. He was also the most controversial and the only one whose employment was terminated by the GMF principals.

Unlike Segal and Traister, Hannig learned of GMF through its newspaper advertisement. He contacted Pearlstein for an interview and was hired without a personal reference. Trombetta conducted several training sessions with Hannig and another new salesman, and the men were drilled in the flip chart presentation. The nine Elgin Pen distributors who testified against Hannig indicated that although he used the standard sales pitch as Trombetta had taught him, he also substantially enlarged upon it. ·

Hannig mentioned several times during his interviews with prospective distributors that there was an affiliation between Elgin Pen and Elgin Watch. He told one person that Elgin Pen was expanding its manufacturing facilities and constructing distribution centers in Chicago and Texas. He claimed that Elgin Pen had secured patents on certain models of its writing instruments. None of these statements had a basis in fact. Hannig also falsely represented to his prospects that several prominent companies, and the Post Office and an air force base, were active Elgin Pen accounts. He erroneously stated to one distributor that Blue Cross benefits were available. Finally, on one occasion Hannig indicated that the figures in the projection sheet were conservative and that distributors could expect much better percentage returns than those represented in the flip chart. As with Traister, however, Hannig consistently pitched the one and one-half to three percent projection as Elgin Pen's actual expectation, according to the testimony of the distributors.

Pearlstein and Hannig disputed the circumstances surrounding the latter's departure from GMF. Pearlstein said that Hannig was fired because of his misrepresentation of the availability of Blue Cross benefits and because he once bartered two parcels of land for an Elgin Pen distributorship. While admitting that he had done these things, Hannig claimed that he had quit like all the other Elgin Pen distributorship salesmen, fed up with high traveling expenses, few sales and difficulties in obtaining commission checks. Whatever the actual cause, Hannig left GMF in November, 1970; poor health was the official reason.

■ The foregoing is not intended as an exhaustive examination of the allegedly fraudulent misrepresentations made by each defendant in his sales presentations. Rather, what we have summarized are the significant false or misleading statements attributed to these salesmen by the Elgin Pen distributors who testified against them.[3] Whether such evidence is sufficient to sustain their convictions for mail fraud is the question to which we now turn.

### III

■ As stated above, our determination of this appeal revolves around the adequacy of the evidence to implicate the defendants in the fraudulent aspects of the Elgin Pen enterprise. Although they need not have been the masterminds of the scheme to defraud, *United States v. Gorman*, 390 F.2d 147, 148 (3d Cir. 1968) (per curiam), and

---

**3.** Each defendant made additional dubious claims during their sales presentations which we have not discussed here because in our view they do not constitute fraudulent misrepresentations and do not in any way tie these salesmen in with the fraudulent scheme concocted by the three GMF principals. For example, representations of G. Martin Frank, Ltd., as a "nationally known company," or description of Elgin Pens as "among the finest writing instruments in the world," at worst can be construed as mere "puffing" and are not cognizable under the federal mail fraud statute. See *United States v. New South Farm & Home Co.*, 241 U.S. 64, 70-71, 36 S.Ct. 505, 60 L.Ed. 890 (1916). *See generally*, Comment, *Mail Fraud—Fraudulent Misrepresentations Must Be Distinguished from "Puffing" or "Sellers Talk" in Offenses Under 18 U.S.C. § 1341*, 22 So.Car.L.Rev. 434 (1970).

More importantly, as more fully developed in the text *infra*, such claims, even if they are found to be misleading, do not tend to indicate that the defendants had knowledge that their employers were engaged in a fraudulent scheme.

concededly they were not in this case, the evidence must indicate that the defendants had knowledge of the fraudulent nature of the G. Martin Frank operation and wilfully participated in the scheme with the intent that its illicit objectives be achieved. *See id.; United States v. Tiche*, 424 F.Supp. 996 (W.D.Pa.), *aff'd mem.*, 564 F.2d 90 (3d Cir. 1977).[4]

The record in this case is barren of any direct evidence of such knowledge and intent on the part of the defendants. Our examination of the testimony comports with the finding of the trial court, in dismissing the conspiracy count, that there was no proof that any of these salesmen were involved in, or privy to, any of the managerial aspects of G. Martin Frank. ·To the contrary, the record reveals that the GMF principals strictly forbade the distributorship salesmen from reading company correspondence or perusing its files. The office manager was instructed to inform the salesmen that such things were none of their business. The salesmen even were restricted in their movements around the GMF office and had to ask permission, for example, to proceed beyond the secretary's desk. It also is clear that these defendants had no role in preparing any of the Elgin Pen promotional material which contained the most damning evidence of the principals' fraudulent intentions.

In the absence of direct evidence, however, the requisite knowledge and intent can be demonstrated circumstantially, *United States v. Carlson*, 359 F.2d 592, 597 (3d Cir. 1966), and where sufficient circumstantial evidence is presented, a jury may properly infer that the defendants were culpably involved with, and knowingly furthered, the fraudulent scheme. *United States v.*

*Tiche*, 424 F.Supp. 996, 1001 (W.D.Pa.), *aff'd mem.*, 564 F.2d 90 (3d Cir. 1977). What we must decide, then, is whether there was substantial evidence adduced by the Government at this trial from which the jury reasonably could have inferred that these defendants knew of the fraudulent purpose of the GMF/Elgin Pen enterprise and wilfully participated therein.

■ Several factors bear upon this determination. A continuing personal or professional relationship between the principal architects of the fraudulent scheme and the defendants might be relevant to show that the defendants were aware of the principals' wrongful purpose. *Cf. United States v. Wilson*, 506 F.2d 1252, 1256–57 (7th Cir. 1974). But evidence of mere ongoing friendships, even where the defendants might have known that their friends were engaged in criminal activity, will not support a finding that the defendants knew or should have known of their friends' specific fraudulent intentions. *United States v. Klein*, 515 F.2d 751, 754–55 (3d Cir. 1975). Here, there was some evidence that Traister had known Trombetta for many years and had worked with him in the past. Traister also knew of Rudolph from the community in which he lived. But there also was evidence that Traister had contacted Kent, GMF's lawyer, and was told that Elgin Pen was a good business opportunity and was "clean." Where the evidence indicates that Traister relied upon this advice from an attorney involved with GMF/Elgin Pen, his prior friendship with one of the company's principals simply is not probative of his knowledge of Trombetta's deceitful plans. *See United States v. Winters*, 389 F.Supp. 1392, 1393 (S.D.N.Y.1975).

4. *Compare United States v. Klein*, 515 F.2d 751 (3d Cir. 1975). In reviewing a conviction for conspiracy and mail fraud, the court in *Klein* stated that "[a]t a minimum . . . it must be shown that [the defendant] has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *Id.* at 753. That this statement referred to the defendant's conviction for conspiracy to commit mail fraud does not distinguish *Klein* from this case. There, the court noted that "[w]ith respect to the instant conspiracy to commit mail fraud, therefore, the government was required to prove the same knowledge required for the substantive offense, that is knowledge of the scheme to defraud the insurance companies of fire insurance proceeds." *Id.* at n. 3a. The court in *Klein* applied the same standard to the substantive mail fraud conviction and reversed that judgment for lack of proof of the defendant's knowledge of the fraudulent purpose of the overall scheme. *Id.* at 754, 758.

■ The existence of excessive financial gain, extravagant expense accounts or over-generous compensation also may implicate a defendant in allegedly illicit activity, or at least serve to put him on notice of suspicious dealings. *Compare Cochran v. United States*, 41 F.2d 193, 202 (8th Cir. 1930), *with United States v. Klein, supra* at 754–55, *and with United States v. Tiche, supra* at 1001. In this case, although the GMF principals drew large salaries in addition to the commissions they earned, and were reimbursed for their expenses, the record indicates that none of the defendant-salesmen made any substantial amount of money while working for GMF/Elgin Pen. We recognize that it need not be proven that the fraudulent schemers were successful in their illegal endeavors. *E. g., Blachly v. United States*, 380 F.2d 665, 672–73 (5th Cir. 1967); *Cochran v. United States, supra* at 199. But the relative lack of success enjoyed by the defendants is relevant in determining the extent of their involvement in the fraudulent aspects of the GMF/Elgin Pen scheme, particularly in view of the handsome rewards reaped by the principals in the midst of a failing enterprise. *Cf. United States v. Klein, supra* at 755 n. 8.

■ Also of significance in evaluating their possible knowledge of the scheme to defraud is the defendants' role in the overall operation. *E. g., United States v. Serlin*, 538 F.2d 737, 744 (7th Cir. 1976); *United States v. Caine*, 441 F.2d 454, 457 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971). Here, the defendants were salesmen and held no positions of authority, nor were they ever involved in the management of GMF. *Compare Foster v. United States*, 178 F. 165, 173 (6th Cir. 1910). And that they were employed by a company later shown to have been fraudulent in nature, will not support an inference of guilty knowledge. *See United States v. Klein*, 515 F.2d 751, 754· 55 (3d Cir. 1975).

■ Although the defendants in no way were connected with the supervision and control of the GMF/Elgin Pen operation, their convictions can be upheld ·if the evidence established that they in some manner joined with the three GMF principals' scheme to defraud. *Reistroffer v. United States*, 258 F.2d 379, 395 (8th Cir. 1958), *cert. denied*, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959). However, that these salesmen performed acts in furtherance of the illicit objectives of the Elgin Pen scheme does not justify a finding that they thereby joined in it, unless their knowledge of its fraudulent purpose also can be demonstrated. *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975).

■ The only link between the GMF principals and the defendants was in the latter's role as Elgin Pen distributorship salesmen. And the only basis for concluding that the defendants, as salesmen, were aware of the fraudulent nature of G. Martin Frank, Ltd., lay in the promotional material prepared by the GMF principals and used by the defendant-salesmen in their sales presentations. If the defendants knew or should have known that the flip chart, for example, was essentially a series of false and misleading statements, and realized the full implications of its deceptive nature, then an inference is raised that they had knowledge of the fraudulent purpose of the entire GMF/Elgin Pen enterprise which incorporated such misrepresentations into its promotional material. *See United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973), *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974); *United States v. Uhrig*, 443 F.2d 239, 242 (7th Cir.), *cert. denied*, 404 U.S. 832, 92 S.Ct. 81, 30 L.Ed.2d 62 (1971).

As summarized above, the primary misrepresentations incorporated into the GMF/Elgin Pen promotional material were the creation of a fictitious corporate officer, Russell E. Bradley; the false claims concerning Cassidy-Richlar and the sweepstakes contest; the phony Dun & Bradstreet letter; the antedated sample pen order forms; the baseless revenue projections in the flip chart; and the fabricated picture of the "Elgin/Pen" factory. Examining the testimony bearing on each of these misrepresentations as they relate to the individual defendants indicates that there was

no evidence from which the jury reasonably could have concluded that the salesmen had knowledge of their false and misleading nature.

There was no evidence that the defendants knew or should have known of the phantom Russell E. Bradley, nor that they were aware that the sweepstakes contest would not be conducted as represented in the brochure. Furthermore, Pearlstein testified that the salesmen did not know that either the Dun & Bradstreet letter or the "Elgin/Pen" factory drawing was falsified. And there was no other testimony indicating that the defendants had such knowledge.

As to the antedated sample pen orders, there was evidence that the salesmen should have known that Elgin Pen was a new company, although how new is not clear. Since these defendants began working for Elgin Pen in early 1970, and since Elgin Pen was represented as "a division of G. Martin Frank, Ltd.," it would not have been unreasonable for them to assume that the sample orders, dated in the latter half of 1969, in fact were genuine.

Pearlstein testified the salesmen were told that the figures in the projection sheet were "assumptions." There was no evidence, however, that the defendants knew, as did the GMF principals who prepared the charts, that the statistics were taken directly from the Nelson James pitch book and were never authenticated. The lack of any foundation for these projections of distributorship income does bear on a determination of the principals' knowledge of their doubtful validity and would support a finding that the principals utilized the figures with a reckless disregard for their probable falsity. *United States v. Cohen*, 516 F.2d 1358, 1367 (8th Cir. 1975). From this it could have been inferred that the projection sheet was prepared by the GMF principals with an intent to defraud since it must have been obvious to them that prospective distributors would rely on such projections in deciding whether to invest in Elgin Pen. However, the defendant-salesmen were not aware of these facts and it would require an unreasonable building of inferences to conclude that this evidence demonstrated that they should have known of the fraudulent purpose for which the projection sheet and typical sales chart were intended. *Cf. United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975), *citing Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).

We conclude, therefore, that there was no substantial evidence presented at this trial from which the jury reasonably could have inferred that the defendants were, or should have been, cognizant of the false and misleading aspects of the GMF/Elgin operation and its promotional material.

The Government argues that the making of false or misleading statements by the defendants in their sales presentations established the necessary link between them and the overall scheme to defraud. To the extent that these allegedly fraudulent misrepresentations were based upon the GMF/Elgin Pen promotional material and the standard sales pitch, including the flip chart, this argument must fail. *Cf. Babson v. United States*, 330 F.2d 662, 665 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964). We have concluded that there was no substantial evidence from which the jury reasonably could have determined that the defendants knew or should have known these claims were false. And, that certain of these claims were in fact false is clearly insufficient to prove that the defendants knew that they were involved in a fraudulent scheme. *United States v. Simon*, 425 F.2d 796, 809 (2d Cir. 1969), *cert. denied*, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). Furthermore, none of the misrepresentations contained in the promotional materials were so patently false, nor were any of the claims so grossly exaggerated, that the salesmen should have been on notice of their dubious nature. *See United States v. Serlin*, 538 F.2d 737, 744 (7th Cir. 1976). Finally, none of the defendants possessed any special knowledge or experience relating to this type of direct mail marketing operation that might have indicated that they should

have known that the revenue projections, for example, deviated significantly from industry experience. *See Babson v. United States, supra* at 665; *cf. United States v. Serlin, supra* at 809.

Furthermore, to the extent that these defendants made false or misleading statements independent of the standard sales pitch, such evidence could not have created an inference of culpable participation in the overall fraudulent scheme. *Chambers v. United States,* 237 F. 513, 525-.26 (8th Cir. 1916); *United States v. Corlin,* 44 F.Supp. 940, 947–49 (S.D.Cal.1942).

At one time or another, all of the defendants exaggerated their role in the GMF/Elgin Pen operation and made false statements concerning their own business backgrounds. However, such misrepresentations did not relate to the essential feature of their presentations—the sale of Elgin Pen distributorships—and hardly can be construed as fraudulent. *Cf. United States v. Serlin,* 538 F.2d 737, 744 (7th Cir. 1976); *United States v. Uhrig,* 443 F.2d 239, 241 42 (7th Cir.), *cert. denied,* 404 U.S. 832, 92 S.Ct. 81, 30 L.Ed.2d 62 (1971). *See generally,* Comment, *Mail Fraud—Fraudulent Misrepresentations Must Be Distinguished From "Puffing" or "Sellers Talk" in Offenses Under 18 U.S.C. § 1341,* 22 So.Car.L. Rev. 434 (1970).[5]

During a couple of interviews, the defendants also falsely stated that Elgin Pen was affiliated in some way with the Elgin Watch Company. According to Pearlstein, however, this was done in disobedience to the explicit instructions of the GMF principals and it is difficult to understand how such violations of company policy can support a finding that the violators were involved in or aware of the company's fraudulent undertaking. *See United States v. Corlin,* 44 F.Supp. 940, 948 (S.D.Cal.1942).

Traister and Hannig, particularly the latter, made certain more significant misrepresentations during their sales presentations. Both, on one occasion each, claimed that Elgin Pen distributors were experiencing better percentage returns than those indicated in the projection sheet. Both also claimed that Elgin Pen was expanding its projection facilities. Once, Traister stated that the marketing method instituted by GMF had been tested and proven successful. Hannig told one distributor that Elgin Pen had several patents on its writing instruments and, on a few occasions, falsely represented certain well-known companies as Elgin Pen accounts.

The ultimate significance of some of these misrepresentations can be questioned. For example, Traister's claim that the GMF marketing method had been tested and proven successful had a basis in fact, as the testimony revealed. The Government's own expert witness testified that such schemes are widely used, have been successful in promoting pen sales,, and are a legitimate and potentially profitable way of doing business. Of course, GMF had not tested its own distributorship program and to the extent that Traister's statement related to Elgin Pen specifically, it was not true.

But even if these false or misleading statements are characterized as fraudulent misrepresentations, they do not establish that the salesmen who made them knew of the fraudulent purpose of the GMF/Elgin Pen scheme. *Chambers v. United States,* 237 F. 513, 525 .26 (8th Cir. 1916); *United States v. Corlin,* 44 F.Supp. 940, 948 (S.D. Cal.1942). *Cf. United States v. Klein,* 515 F.2d 751, 754 55, 757 -58 (3d Cir. 1975); *but cf. Cochran v. United States,* 41 F.2d 193, 200 -202 (8th Cir. 1930).

A somewhat comparable situation confronted this court in *United States v. Klein,* 515 F.2d 751 (3d Cir. 1975). In that case, involving a scheme to defraud certain insurance companies, a public fire insurance adjuster challenged his convictions for conspiracy to commit, and for the substantive offense of, mail fraud. The financially-distressed owners of a building had hired an arsonist to destroy it so that they could collect on the insurance policies covering the property. The evidence established · that the defendant-adjuster had been re-

---

**5.** See note 3 *supra.*

ferred to the owners by the arsonist, to whom the defendant had paid a referral fee. The defendant admitted that he had had prior dealings with the arsonist, had friends who were arsonists, and adjusted fires "with his eyes closed." A prior conviction of the defendant for a similar offense also was introduced. However, the appellate court in *Klein* held that this evidence was insufficient to sustain the defendant's conviction for mail fraud. Although recognizing that the evidence supported an inference that the defendant knew that arson had occurred, and implicitly that he may have prepared a falsified fire insurance claim for the owners of the building, the *Klein* court concluded that this was irrelevant to the mail fraud charge since it in no way established the defendant's knowledge of the underlying scheme to defraud the insurance companies. *Id.* at 754–55, 757–58.[6]

Similarly, in this case, although the defendants might have made fraudulent misrepresentations during the course of their individual sales presentations, the jury could not reasonably infer that the salesmen knew of the fraudulent purpose of the overall GMF/Elgin Pen scheme. *Cf. Babson v. United States*, 330 F.2d 662, 665 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964). Nor was there such a consistent pattern of similar misrepresentations by all of the defendant-salesmen as to allow the jury reasonably to conclude that these false or misleading statements were knowingly made in furtherance of the illicit enterprise. *Compare United States v. Corlin*, 44 F.Supp. 940, 947–48 (S.D.Cal.1942), *with Reistroffer v. United States*, 258 F.2d 379, 387 (8th Cir. 1958), *cert. denied*, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959).

Taken in the light most favorable to the Government, and resolving all inferences in support of the jury's verdicts, the evidence here established that the defendants occasionally made false or misleading statements independent of the GMF/Elgin Pen scheme. Although we recognize that a separate scheme to defraud could have been hatched by these salesmen within the overall fraudulent scheme, *e. g., United States v. Thaw*, 353 F.2d 581 (4th Cir. 1965), such individual schemes were neither alleged nor proven by the Government in this case. There was no evidence here of the sort of concerted action on the part of the defendants, nor of the planning or pattern which have been recognized as the hallmarks of a fraudulent scheme. *See United States v. Platt*, 435 F.2d 220, 222–23 (7th Cir. 1970), *cert. denied*, 402 U.S. 913, 91 S.Ct. 1394, 28 L.Ed.2d 655 (1971), *citing United States v. Bachman*, 246 F. 1009, 1012 (E.D.Pa.1917).[7]

In support of its contentions, the Government relies chiefly upon *United States v. Serlin*, 538 F.2d 737 (7th Cir. 1976), and *United States v. Cohen*, 516 F.2d 1358 (8th Cir. 1975). The fraudulent schemes involved in both of those cases are factually similar to the one here in that the defendants sold distributorships or franchises for consumer marketing operations and employed fraudulent misrepresentations and deceptive promotional material in making their sales. In addition to being distributorship salesmen, however, the defendants in *Serlin* and *Cohen* were also the principal architects of, and retained managerial control over, the fraudulent schemes involved in those cases. Since Segal, Traister and Hannig were not involved in the creation of GMF/Elgin Pen, nor in the preparation of its promotional material, and had no role in the corporate hierarchy other than as salesmen, *Serlin* and *Cohen* are inapposite to our determination and the Government's reliance upon them is misplaced.

In sum then, we conclude that the evidence presented at the defendants' trial was insufficient to establish their knowing

---

6. See note 4 *supra*.

7. Even if the evidence established independent schemes of the salesmen, such evidence could not properly convict the defendants here since the only scheme alleged in the indictment was

that of the GMF/Elgin Pen principals, and it was incumbent upon the Government to prove that scheme substantially as it was alleged. *E. g., Jeffers v. United States*, 392 F.2d 749, 752–53 (9th Cir. 1968).

participation in the overall fraudulent scheme and thus the jury could not properly have convicted them on the substantive mail fraud counts.

## IV

 In the alternative, the Government argues that the defendants' convictions can be affirmed under 18 U.S.C. § 2, on a theory of aiding and abetting. Although it is true that one who aids or abets the commission of an offense is equally liable as a principal, it is necessary that the alleged aider and abettor associate himself with the unlawful venture and participate in it with the intent that its illegal objective be attained. *United States v. Crockett*, 534 F.2d 589, 600 (5th Cir. 1976). In order to prevail on this theory, then, the Government had to demonstrate that the defendants were aware of the GMF principals' criminal intent. *United States v. Cades*, 495 F.2d 1166, 1169 (3d Cir. 1974). Such an awareness can be inferred from evidence of collaboration between the defendants and the principals but it must be established that the defendants facilitated the principals' crime with the intent to do so. *Id.* at 1168. An unknowing participation in a criminal enterprise is not sufficient under the aiding and abetting statute. *United States v. Newman*, 490 F.2d 139, 142-43 (3d Cir. 1974). Where, as here, there was no substantial evidence from which the jury could reasonably conclude that the defendants 1) knew of the GMF principals' illicit intentions and 2) knew or should have known of the fraudulent aspects of the Elgin Pen scheme, their convictions cannot be sustained on an aiding and abetting theory.

## V

In conclusion, for the reasons stated above, the record in this case presents insufficient evidence to support the defendants' convictions.

The convictions will be reversed.