ORENSTEIN ADVERTISING, INC.

v.

The NEW YORK TIMES.

Civ. A. No. 90–6339.

United States District Court, E.D. Pennsylvania.

July 19, 1991.

Ronald Jay Smolow, Michael H. Landis, Smolow & Landis, Philadelphia, Pa., for plaintiff.

Catherine N. Jasons, Kelley, Jasons, McGuire & Spinelli, Philadelphia, Pa., Deborah R. Linfield, The New York Times Co., Dean Ringel, Kevin N. Whitney, Adam Liptak, Cahill Gordon & Reindel, New York City, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Before me is defendant's Fed.R.Civ.P. 12(b)(1) and 12(b)(6) motion to dismiss plaintiff's first amended complaint. Plaintiff's complaint seeks to certify a class of all individuals and businesses that placed classified advertising in *The New York Times* since January 1, 1975, and were fraudulently billed. Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) and (c), and under state law for fraud and misrepresentation; "misrepresentation and non-disclosure," compl. at 22; negligent misrepresentation; breach of contract; and unjust enrichment. Defendant asserts plaintiff's RICO allegations are deficient and there is no actionable fraud. I will grant the motion.

BACKGROUND

Over an eight-month period in 1990, plaintiff Orenstein Advertising, Inc., placed sixteen advertisements in the help wanted portion of *The New York Times*'s classified advertising section. Orenstein alleges the Times fraudulently overcharged for each of these advertisements.

Each year the Times publishes and provides to all advertisers the "New York Times Classified/Display Advertising Rate Card" ("rate card"). Compl. at exhibit A. In the rate card, the Times agrees to publish certain classified advertisements and

displays its fees for doing so. The rate card details the types and sizes of ads it will print and the cost for special and ordinary advertisements and services. On page 14 of the rate card, the "employment-classified" rates are shown. At the top of the page, it states:

*Rates Per Column Inch:*    *Non–Standard Units:*
    *Standard Units*
*Rates Per Agate Line*     *Column Inch Rate*
             *Plus 5%*

The rate card also provides the "agate line rate" for "open," help-wanted ads will be $19.10 in the Sunday edition of the paper.[1] The rate card does not explain the definition of "agate line." It does, however, provide a chart demonstrating how increasing the size of the print type will increase the billing rate. Rate card at 33. *See* appendix, exhibit 1. The chart shows type sizes and states each line of print using the standard "Times Gothic" type will be charged as one line, larger, "10–point" type, will be charged as two lines, and even larger, "14–point" type, will be charged as three lines. *Id.* The rate card gives this billing information through 72–point type. The rate card's description of the "mechanical requirements" also provides: "Each line of 10 pt. type is charged as 2 lines; 14 pt. as 3 lines ... 72 pt. as 14 lines." *Id.* at 31. The Times permits blank lines or "white space"[2] to be included in an advertisement. *Id.* The Times counts a blank line or a "white space," regardless of its depth, as one agate line.

Along with the rate card, advertisers are given an "agate line ruler." This ruler is calibrated with fourteen agate lines per inch and can be used to measure the length of each ad in agate lines and in centimeters. Exhibit B, attached to plf.'s RICO case statement. This ruler, however, cannot account for the additional charge for larger typeface letters which are the source of the dispute here.

Orenstein claims the ruler measurement of the ad multiplied by the cost per line should equal the advertiser's total bill. It contends it is reasonable for an advertiser to conclude that the Times would use the agate line ruler because it provides the tool. Orenstein concludes the Times deceives advertisers by using a computer to calculate its total charge, does so in a way that is not explained, and thus perpetrates a fraud.

The Times does not dispute Orenstein's factual allegations. For help-wanted ads, the Times does use a computer to count lines instead of using the ruler to measure space. The Times, though, denies there is fraud. The Times asserts the rate card, specifically the type-size chart and the "mechanical requirements" section, clearly states that larger typeface size will result in an extra charge. The Times also maintains using the computer is consistent with the rate card information and is not inconsistent with distributing the ruler.

Obviously, the Orenstein and the Times methods create different charges for the same ad. Orenstein's first advertisement clearly demonstrates the point. The ad had three lines of 10–point type with the balance in standard "Times Gothic" 8–point type. Orenstein used the agate line ruler to determine the ad was forty-two agate lines in length. Compl. at exhibits B and C–1. *See* appendix, exhibit 2. At $19.10 an agate line, it felt the total cost should have been $802.20. Orenstein, however, did not consider the three lines of larger type, although it did measure and include the "white space."

In contrast, the Times used the type-size chart and charged for forty-three lines. The Times counted the lines with standard "Times Gothic" 8–point type (31) and the "white space" between the paragraphs and headings (6 lines). Then, it added six lines for the three lines with 10–point type. This calculation added $19.10 to Orenstein's bill. Since Orenstein placed sixteen ads, 750 actual agate lines by ruler, the alleged overcharge was $668.50. *See* appendix, exhibit 4.

---

**1.** Orenstein only placed ads falling within this category. Its ads were billed using the "agate line rate" for standard units.

**2.** "White space" may be just one blank line or it may be a space between lines of print that is larger than one blank line.

## DISCUSSION

This is a simple case made hard by the parties. The essential facts are not disputed. Both parties agree the Times' rate card[3] should be the focus of this litigation and both parties agree the type-size chart and the "mechanical requirements" section include the larger-type size billing information. The essential and uncomplicated question to resolve is whether or not the chart and the "mechanical requirements" sections of the rate card permit the Times to charge more when a larger type was used in classified advertisements.

■ Orenstein contends the Times fraudulently overcharged because the reference to "agate line rate" on page 14 of the rate card precludes application of the "mechanical requirements" section and the chart on pages 31 and 33, respectively. Orenstein also argues the number of agate lines can only be determined using the agate line ruler and not the computer line count method. The Times maintains the rate card clearly and unambiguously informs advertisers of the additional charge for larger type and the number of agate lines will be determined by using the chart's type-size scale and the line-counting computer.

The Times is correct and there is no fraud. The rate card on its face plainly informs an advertiser that the cost of running an ad in the Times is dependent upon the number of lines of print, the number of blank lines, and the number of lines of print using larger than standard, "Times Gothic," 8–point type. The rate the Times charges per line is not difficult to find and neither are the chart and the "mechanical requirements" section. They are easily understood and unambiguous. After reading the rate card, a reasonable person could not be mislead as to how much placing his ad in the classifieds would cost him. *Kehr Packaging, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1416 (3d Cir.1991) (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d

Cir.1978)) (finding no fraud where the defendant's acts could not be "reasonably calculated to deceive a person of ordinary prudence and comprehension."). As a result, there is simply no basis for a fraud claim.

In order to create a cause of action, Orenstein exaggerates the importance of the term "agate line rate." Orenstein asserts an agate line is a unit of space, not a line of type. It then argues the Times must use the agate line ruler to measure the length of each ad in agate lines rather than the computer line counting method and when the Times did not do so, it committed fraud. For support of this contention, it refers me to a number of advertising journals and textbooks which describe an agate line as a unit of space. However, there is no cause to look to outside sources for the meaning of the rate card.

The term "agate line rate" can only be interpreted in light of all parts of the rate card, including the chart and the "mechanical requirements" section. Whether or not an agate line has a special meaning in the advertising industry is not important because the rate card is clear on its face. The agate line rate is only relevant after determining the number of agate lines, and that number includes additional charges for larger typeface letters. The Times is not constrained by the limitations Orenstein seeks to place on the use of the "agate line rate" term in the rate card. To the contrary, the Times may charge more for lines with larger than normal type and can use a computer to calculate the number of agate lines and the total fee to be charged for each ad.

Orenstein argues the chart and the "mechanical requirements" section do not provide any information concerning how blank lines and "white space" are billed, so the rate card should be treated as ambiguous and disregarded. In other words, Orenstein maintains the Times cannot charge

---

**3.** The rate card is attached as an exhibit to the complaint. Fed.R.Civ.P. 10(c) provides that any exhibit attached to a pleading may be treated as part of the pleading. Thus, I may examine the rate card when considering a motion to dismiss. It is therefore unnecessary to treat this motion as one for summary judgment.

for lines with larger type *and* for blank space because there is no reference on the rate card to the latter. This contention must be rejected for two reasons.

First, the chart does provide blank line billing information. It states: "This is Times Gothic. Each line of type is charged as one line. Approx 33 characters and *spaces* to a line in lower case...." Rate card at 33. (Emphasis added) Thus, it can be inferred that a "line" which happens to be all spaces, rather than characters, would be counted as one agate line. This is exactly how the Times billed Orenstein for blank lines in its ads.

Second, where there was a blank space deeper than a single line of "Times Gothic" type, the Times still charged for that space as though it was but a single line of type. Had an agate line ruler been used, the number of billable agate lines would depend on the depth of the blank space. Orenstein benefitted from the way the Times computed its charges because there were blank spaces in Orenstein's ads that were deeper than one line of "Times Gothic." While other publications may have charged in a different way—and while the Times may have charged other types of classified advertisers a different way—there was no fraud in the way the Times computed the amounts due from Orenstein.

In sum, there is nothing hidden in the Times' classified advertising billing methods. The rate card is plain on its face. It states that lines with larger than 8–point type will be charged as multiple lines depending on the size of the type. The use of the term "agate line rate" does not negate the rest of the rate card, which provides for a unique, but well-explained, method for counting agate lines. The Times need not abandon its computer line counting method merely because it sends rulers to advertisers for their use in figuring other rates. The Times creates no implied promise to use the ruler by providing it as a courtesy. The bottom line is that there is no fraud in this case. Orenstein was billed according to the rate card and the rate card gave it sufficient notice of how much it would cost to place an ad in the classified advertising section of *The New York Times.*

◼ Quite apart from the fact that the rate card is clear and the Times' charges followed the rate card is the fact that even if the rate card had been ambiguous, there would still be no fraud. The rate card and ruler at best amounted to an offer by the Times to print classified advertising. Orenstein accepted that offer sixteen times over an eight-month period by placing its ads. Just because Orenstein interpreted the offer one way and the Times some other way—even if the offer had been deliberately vague—does not amount to fraud. Ambiguity in a contract may lead to a host of problems but fraud is not likely to be one of them and would not have been under the circumstances here. And, of course, any time Orenstein was dissatisfied with the way it was being billed, it could have taken its business elsewhere.

◼ Because I find there is no actionable fraud in this case, Orenstein's RICO claims must be dismissed. An essential element of any RICO claim is proof of a "scheme or artifice to defraud," *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1416 (3d Cir.1991). Orenstein cannot meet that burden. Its RICO claims are the only basis for this court's jurisdiction over this dispute. Thus, I will also decline to exercise my pendent jurisdiction and the state law claims can also be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The parties briefed many issues other than the sufficiency of the fraud allegations. I express no opinion on those matters as it is unnecessary to do so.

1138

## Classified Type Sizes

**FOR 10-COLUMN MEASURE**

This is Times Gothic  Each line of type charged as one line  Approx 33 characters and spaces to a line in lower case. 22 TO A LINE IN CAPITALS

This is 10-Point
Each line of type charged as two lines Approximately 26 characters and spaces to a line in lower case  21 TO A LINE IN CAPITALS

This is 14-Point
Each line of type charged as three lines  Approximately 19 characters and spaces to a line in lower case; 15 TO A LINE IN CAPITALS

This is 18-Point
Each line of type charged as four lines.  Approximately 14 characters and spaces to a line in lower case; 11 TO A LINE IN CAPITALS

# 30-Point
Each line of type charged as six lines  Approximately 13 characters and spaces to a line in lower case. 10 TO A LINE IN CAPITALS.

# 36-Point
Each line of type charged as seven lines  Approximately 11 characters and spaces to a line in lower case; 9 TO A LINE IN CAPITALS

# 48-Point
Each line of type charged as ten lines  Approximately 11 characters and spaces to a line in lower case. 9 TO A LINE IN CAPITALS

# 60-Point
Each line of type charged as twelve lines  Approximately 10 characters and spaces to a line in lower case. 8 TO A LINE IN CAPITALS

# 72-Point
Each line of type charged as fourteen lines  Approximately 8 characters to a line in lower case. 6 TO A LINE IN CAPITALS

Exhibit 2

Nurse, RN

## HOME CARE
## COORDINATOR

Put your experience to
best advantage...with
a healthcare/HMO leader!

US HEALTHCARE is seeking a fulltime Home Care Coordinator. Duties
include coordination and monitoring of home care services for HMO
members. The qualified candidate will have an RN degree (BSN
preferred) plus two years of hospital experience. Also, candidate
must have one or more years of Home Care experience (discharge
planning preferred). Excellent organizational skills and the
proven ability to work independently are also necessary.

If you're looking for a new and challenging way to utilize your
nursing skills, US HEALTHCARE is for you. We provide an
outstanding work atmosphere, competitive salary and fully paid
health benefits. To apply, please send your resume, with salary
requirement, to: Personnel Recruiter...

US HEALTHCARE
Mack Centre IV
South 61 Paramus Rd.
Paramus, NJ 07652
or call JoAnn at:
(201) 843-6200, X 5083

Equal Opportunity Employer

ATTN: ANNE ROTHMAN

HOMCRCOR.USH
Newark Star Ledger
new york times

Exhibit 3

LINE COUNT OF THE CLASSIFIED
ADVERTISEMENT SUBMITTED AS PART OF EXHIBIT C-1
TO AND MADE PART OF THE AMENDED COMPLAINT

| Type Size | Line as it Appears in Printed Advertisement Reproduced in Exhibit C-1 | Lines Counted as Set Forth at p. 33 of The Times's Rate Card (Exhibit A to the Complaint) |
|---|---|---|
| agate | NURSE, RN | 1 |
| white space | | 1 |
| 10 Point | HOME CARE | 2 |
| 10 Point | COORDINATOR | 2 |
| white space | | 1 |
| agate | Put your experience to | 1 |
| agate | best advantage ... with | 1 |
| agate | a healthcare/HMO leader! | 1 |
| white space | | 1 |
| agate | US HEALTHCARE is seeking a full | 1 |
| agate | time Home Care Coordinator. Duties | 1 |
| agate | include coordination and monitoring | 1 |
| agate | of home care services for HMO mem- | 1 |
| agate | bers. The qualified candidate will have | 1 |
| agate | an RN degree (BSN preferred) plus two | 1 |
| agate | years of hospital experience. Also, can- | 1 |
| agate | didate must have one or more years of | 1 |
| agate | Home Care experience (discharge | 1 |
| agate | planning preferred). Excellent | 1 |
| agate | organizational skills and the proven | 1 |
| agate | ability to work independently are also | 1 |
| agate | necessary. | 1 |
| white space | | 1 |
| agate | If you're looking for a new and chal- | 1 |
| agate | lenging way to utilize your nursing | 1 |
| agate | skills, US HEALTHCARE is for you. We | 1 |
| agate | provide an outstanding work atmos- | 1 |
| agate | phere, competitive salary and fully | 1 |
| agate | paid health benefits. To apply, please | 1 |
| agate | send your resume, with salary require- | 1 |
| agate | ment, to: Personnel Recruiter ... | 1 |
| white space | | 1 |
| 10 Point | US HEALTHCARE | 2 |
| agate | Mack Centre IV | 1 |
| agate | South 61 Paramus Rd. | 1 |
| agate | Paramus, NJ 07652 | 1 |
| agate | or call JoAnn at: | 1 |
| agate | (201) 843-6200, X 5083 | 1 |
| white space | | 1 |
| agate | Equal Opportunity Employer | 1 |

ACTUAL LINES COUNTED    43

TOTAL LINES BILLED    43

EXHIBIT "B"

| 1. Exhibit | 2. Advertising Date | 3. Adver. Subject | 4. Size of Advi- No. of Agate Lines | 5. No. Of Lines Billed By NY Times | 6. NY Times Advertising Rate Per Agate Line | 7. Amount Charged In Excess of Actual Agate Lines |
|---|---|---|---|---|---|---|
| C-1 | 01/07/90 | US Healthcare | 42 | 43 | $ 19.10 | $ 19.10 |
| C-2 | 01/14/90 | US Healthcare | 32 | 33 | 19.10 | 19.10 |
| C-3 | 02/11/90 | US Healthcare | 40 | 41 | 19.10 | 19.10 |
| C-4 | 02/25/90 | Wefa Group | 67 | 71 | 19.10 | 76.40 |
| C-5 | 03/18/90 | US Healthcare | 48 | 51 | 19.10 | 57.30 |
| C-6 | 03/25/90 | US Healthcare | 28 | 29 | 19.10 | 19.10 |
| C-7 | 03/25/90 | Children's Hosp. of Phila. | 42 | 44 | 19.10 | 38.20 |
| C-8 | 04/01/90 | Hahnemann Univ. Hospital | 54 | 56 | 19.10 | 38.20 |
| C-9 | 04/22/90 | US Healthcare | 46 | 48 | 19.10 | 38.20 |
| C-10 | 05/06/90 | US Healthcare | 50 | 53 | 19.10 | 57.30 |
| C-11 | 05/06/90 | US Healthcare | 37 | 38 | 19.10 | 19.10 |
| C-12 | 06/10/90 | US Healthcare | 40 | 42 | 19.10 | 38.20 |
| C-13 | 08/12/90 | IKEA | 109 | 116 | 19.10 | 133.70 |
| C-14 | 08/19/90 | IKEA | 29 | 30 | 19.10 | 19.10 |
| C-15 | 08/26/90 | Hahnemann Univ. Hospital | 33 | 34 | 19.10 | 19.10 |
| C-16 | 08/26/90 | US Healthcare | 53 | 56 | 19.10 | 57.30 |
| | | Totals | 750 | 785 | | 668.50 |