# UNITED STATES *v.* NEW SOUTH FARM AND HOME COMPANY.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 808. Argued April 7, 1916.—Decided April 24, 1916.

While the fraudulent advertisements covered by the provisions of § 215, Criminal Code, prohibiting using the mails for advertisements, may not include those which merely puff the article to be sold by exaggerating its qualities, it does prohibit using the mails for fraudulent statements assigning to such article qualities which it does not possess.

An article alone is not necessarily the inducement and compensation for its purchase, but the use to which it may be put and the purpose it may serve; and there is deception and fraud within the meaning of § 215, Criminal Code, when the article is not of the character represented and hence does not serve the purpose.

Persons employing such representations, if they are false, are engaged in a scheme to defraud within the meaning of § 215, Criminal Code.

The demurrer to an indictment under § 215, Criminal Code, having been sustained and the Government having appealed under the Criminal Appeals Act, and the appellee having contended that the court below passed only on the sufficiency of the indictment, and did not consider the statute, *held* that, although such contentions did involve a consideration of the indictment, they involved also the construction of the statute; but, in reversing the District Court as to its action in sustaining the demurrer, this court has no intention of controlling the District Court in its construction of the indictment and so remands the case.

THE facts, which involve the construction and application of § 215 of the Federal Criminal Code, are stated in the opinion.

*Mr. Assistant Attorney General Wallace* for the United States.

*Mr. W. Knox Haynes* for defendants in error.

MR. JUSTICE McKENNA delivered the opinion of the court.

This writ of error is directed to a decision of the District Court sustaining a demurrer to an indictment and is prosecuted under the Criminal Appeals Act, it being contended by the Government that the decision involved the construction of § 215 of the Criminal Code. The opposing contention is that the court passed only on the sufficiency of the indictment as a criminal pleading and that, therefore, the writ of error should be dismissed. The contentions are repeated here, and make the issue. They necessarily require a consideration of the indictment. It is constituted of three counts. Their foundation is § 215, *supra*, which, so far as material, reads as follows: "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, . . . shall, for the purpose of executing such scheme or artifice, or attempting so to do, place, or cause to be placed, any letter, . . . circular, . . . or advertisement, . . . in any post office, . . . to be sent or delivered by the post office establishment of the United States, . . ." etc.

The section is a somewhat enlarged successor of § 5480, Revised Statutes, which provides: "If any person having devised . . . any scheme or artifice to defraud, . . . shall, in and for executing such scheme or artifice, or attempting so to do, place any letter . . .," etc.

As showing a violation of § 215 the first count of the indictment charged the following facts, which we state narratively: The individual defendants are directors and stockholders of the New South Farm & Home Company, a corporation engaged in selling approximately 142,000 acres of land, referred to as the Burbank-Ocala colony and

the Florida-Palatka colony, situated in Putnam, Marion and Clay counties, Florida. They devised a scheme to defraud certain persons, who were named, and other persons, of their money and property, with the intention to convert the same to the use and gain of the defendants and the corporation, by means of correspondence and communications through the post office establishment of the United States and by means of oral and verbal communications, by offering to sell to such persons, and inducing them to purchase, certain 10-acre farms upon certain terms through false and fraudulent representations concerning the title, fertility, value, drainage, location, environs, and survey of the farms and the improvements made or to be made thereon.

The representations were these: The lands and farms were not swampy; the largest ocean steamers operating between New York and Jacksonville could load at Palatka; a family could make enough on one farm during the first year to support itself and save money; three crops a year could be grown; every month in the year was a growing month, that is, some farm or truck product could be raised during each month of the year; the farms were surrounded with orange and citrus fruit groves and vegetable truck farms; the farms had fine roads running through them, were high and well drained and on the whole like the lands of Kansas, Nebraska, Iowa and Illinois; artesian wells were scattered about on the farms or "could be obtained by going down 100 feet"; the land was divided into 160-acre tracts; roads were being built around each 160-acre tract and each 10-acre farm would face on a road, and ditches were being dug so that each farm would be drained; many miles of fence had been erected and hundreds of homes and many school houses had been built; the school houses were more than comfortably filled with pupils, and more schools would have to be built to take care of the rapid growth of the colonists settling upon the farms; com-

fortable hotels had been built upon the lands and farms and improvements of all kinds were going forward at a wonderful rate; lumber was cheap and homes could be built without nearly so great expense as in most places in Florida and at about one-half of the expense the same would cost in the North; the Title Guarantee Company of Jacksonville, Florida, would guarantee the title, with which company the New South Farm & Home Company had made arrangements so that purchasers might know that their investments were safe; the farms were cut over and ready to go upon at once and there were no timber leases upon the lands; the defendants were not land brokers or speculators; the New South Farm & Home Company owned the land outright, the title having been approved by the best attorneys, and any one buying a farm could depend upon securing a clear title as the company was selling something it owned itself; the farms were free from mosquitoes, malaria, and insects of all kinds and were below the frost line; the company had secured telephone connections with Palatka and with local exchanges at other places (they are named) which would place every farm "in direct touch with the community at all times;" the lands and farms were located high and dry and in a section well drained; hundreds of people had settled on them and at the little city of Burbank the lands and farms had increased—doubled, trebled and quadrupled—in price, and the same was true of the lands owned by the company at Silver City, and a thousand settlers were on the lands who could sell them at a large profit; land selling at $30 an acre would be worth in two years $200 and $300 per acre; well-stocked stores and factories were located upon the lands and they were the best located and the most fertile lands in America, and Luther Burbank had been arranged with for "the exclusive right for the production of certain of his farm products"; there would be installed a Burbank producing

station on the lands and farms and the purchasers of the latter would share in the profits of the station, the director of which would be available for the needs of the purchasers; one could get out of a Pullman car on the farms, use a long distance telephone, have the daily paper, rural free delivery and all the comforts of home.

There were other representations of fact, and, to give emphasis to those which we have enumerated, it was charged that the pictures in the publications sent out by the defendants represented the true conditions to be seen on the farms.

All of the representations were explicitly repeated and charged to be false; that defendants well knew them to be so and intended by them to deceive the persons to be defrauded and to induce such persons to part with their money and property in the purchase of the farms.

That the representations were made and communicated by the defendants to the persons intended to be defrauded through and by means of oral statements, circulars, maps, advertisements, photographs, etc., so worded, drawn, constructed, presented and expressed as to deceive; but all too voluminous to be set forth in the indictment, wherefore the grand jurors omitted them.

That the defendants deposited in the United States mail at Jacksonville and Palatka, in the Southern District of Florida, certain publications known as "The New Florida" and "Ten Acres and Freedom" and certain other letters, prints, pamphlets, magazines and publications containing the false representations set out above, which were addressed to the persons intended to be defrauded and on which legal United States postage had been paid.

The second count charged the defendants with entering into a conspiracy to commit the offense described in the first count and repeated its allegations and representations, varied only to meet the difference in the crime

charged.   In other words, there were allegations which
charged that the conspiracy was to be accomplished by
the representations enumerated in the first count, that
they were false and known to be so and made with the
same fraudulent purpose and to be accomplished by the
use of the United States mails.   Two letters from the
company, signed by defendant Seig as president, were
set out in the indictment.

The third count was also like the first in its general
charges and designated by name the persons that were
intended to be defrauded.   The same representations
were charged to have been made "by publishing and
causing and procuring to be published divers prints,
papers, pamphlets, booklets, circulars, and divers adver-
tisements."   The falsity of the representations was de-
clared, and that the scheme of fraud was to be accom-
plished by the use of the United States mails.   A letter
was quoted.

The defendants demurred to the indictment.   The
demurrer is a very voluminous document and practically
defies condensation.   It charges that the indictment
does not, nor does any count of it, "aver and charge any
offense against the United States," that each and every
count thereof is insufficient in that they do not, nor does
either of them, aver the facts constituting a scheme to
defraud; that each and every count is insufficient for
repugnancy, uncertainty, ambiguity and evasiveness;
and that each and every count is insufficient for want
of distinct and adequate specifications of the particulars
wherein the several representations, called in the count
false representations, were false.

The demurrer then attacks each count separately,
and with much elaboration and with repetition of the
allegations of the indictment sets out with particularity
wherein no offense against the United States was charged.

The court sustained the demurrer, resting its decision

upon the second and third grounds of demurrer which, we have seen, charged that neither the indictment nor any of its counts averred or charged an offense against the United States or averred facts which constituted a scheme to defraud. It was' said, "The scheme to defraud is alleged in the first and third counts, and the conspiracy count also sets out the same scheme. So that if the scheme to defraud set out in each of said counts is not such a scheme as is punishable under the law, the entire indictment must fail."

Describing the representations, the court said they "are' as to the quality of the land, climate, crops to be raised, advantages to be obtained, and promises of improvement, etc." And further: "There is no denial of the-facts of the ownership of the lands, although there is a denial that all the titles were perfect. Nor is there denial that the land was worth fully as much as was to be obtained therefor. For aught that appears in the indictment the lands to be obtained were worth fully as much as was to be paid by the parties purchasing; that the parties engaged in the sale were legitimately engaged in the sale of the lands."

The court regarded the business as legitimate and held that the statute was not violated by puffing the qualities of the article sold in advertising it. In other words, as the court expressed it, "raising the expectations of the purchaser, but giving that purchaser value received for his money, but not fulfilling those expectations," was not an offense against the statute. And, further, the court said that the deduction from the authorities referred to by counsel "is that the scheme must be one to defraud the party or by false promises, pretenses, etc., deprive him of money or property without adequate value. Mere puffing or exaggeration of qualities, usefulness, opportunities or value of an article of commerce, where the purchaser gets the article intended to be pur-

chased and the value of the article is measured by the price paid, do not constitute the false representations, promises, etc., denounced by the statute."

We have made these excerpts from the opinion of the court the better to handle the contentions of the parties, which, as we have seen, are quite accurately opposed, the Government asserting that the court construed the statute and thereby justifying its appeal to this court; the defendants insisting the court construed only the indictment as a pleading and that therefore this court is without jurisdiction.

We concur in the view of the Government. The court, we think, construed the statute and misapprehended its import. Mere puffing, indeed, might not be within its meaning (of this, however, no opinion need be expressed), that is, the mere exaggeration of the qualities which the article has; but when a proposed seller goes beyond that, assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has but invents advantages and falsely asserts their existence. he transcends the limits of "puffing" and engages in false representations and pretenses. An article alone is not necessarily the inducement and compensation for its purchase. It is in the use to which it may be put, the purpose it may serve; and there is deception and fraud when the article is not of the character or kind represented and hence does not serve the purpose. And when the pretenses or representations or promises which execute the deception and fraud are false they become the scheme or artifice which the statute denounces. *Harris* v. *Rosenberger* (C. C. A., 8th Cir.), 145 Fed. Rep. 449; *O'Hara* v. *United States* (C. C. A., 6th Cir.), 129 Fed. Rep. 551, 555; *Colburn* v. *United States* (C. C. A., 8th Cir.), 223 Fed. Rep. 590; *Wilson* v. *United States* (C. C. A., 2nd Cir.), 190 Fed. Rep. 427. See also *United States* v. *Barnow,* 239 U. S. 74. Especially is this true in the purchase of

small tracts for homes, and upon this, if the allegations
of the indictment are true, the defendants touched every
string of desire by false statements, and sounded every
note that could excite and delude. We need not repeat
the representations; and they were made graphic, it is
alleged, by pictures and photographs.

Indeed, if it could be admitted that the article offered
for sale and its price could be balanced the one against
the other, the price necessarily would be the expression
of value and be constituted of all the attributes of the
article, intrinsic and extrinsic; and it needs no comment
to show that a 10-acre farm with the character, environ-
ments, and facilities described, its price doubling, trebling
and quadrupling within a year, has a seduction more
powerful than one not advancing in value, but, it may be,
receding, that is of swampy, not of high-land, character,
without fertility, hotels, roads, artesian wells, citrus
groves, Pullman cars, steamship and other faciliti⸱s
which the literature of defendants describes and the in-
dictment alleges.

We can entertain no doubt that those employing such
representations, if they are false, have engaged in a scheme
to defraud. The defendants did not seem to be afraid
of repelling by excess, and extravagance was even used
in a personal communication. In a letter which was set
out in the indictment it was said: "Our settlers are arriv-
ing daily and occupying their farms. The land is being
rapidly cleared, crops are being planted, houses erected,
stores built, and, on a whole, it is impossible for us to set
forth in a letter to you exactly how stupendous is the
work that is going on there. Without a question of a
doubt the Florida Palatka Colony is enjoying the greatest
prosperity."

Against these considerations defendants contend that
there was, notwithstanding, only a construction of the
indictment, but ask that, if we are of a different view,

the case be reversed only so far as the statute was construed and remanded for action upon the other causes assigned for demurrer, involving, as they say, the sufficiency of the indictment as a criminal pleading. The difficulty is to indicate a distinction. We can only say we have no intention to control the District Court in its construction of the indictment, and we have no doubt the learned court will be able to adjust its action to this opinion. *United States* v. *Portale*, 235 U. S. 27, 31.

*Reversed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.