James D. GENTRY, et al., Plaintiffs,

v.

HARBORAGE COTTAGES–STUART, LLLP, et al., Defendants.

Case No. 08–14020–CIV.

United States District Court, S.D. Florida.

Feb. 13, 2009.

 

Owen Schultz, Esq., and Robert Payne Summers, Esq., McCarthy, Summers, Bobko, Wood & Sawyer, P.A., Stuart, FL, Robert J. Gorman, Esq., Robert J. Gorman, P.A., Fort Pierce, FL, for Plaintiffs.

Sandra Jessica Millor, Esq., Greenberg Traurig, Miami, FL, for Defendants.

## ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDG-MENT; GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDG-MENT

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendants' Motion for Summary Judgment (dkt. # 85) and Plaintiffs' Motion for Summary Judgment (dkt. # 89).

UPON CONSIDERATION of the Motions, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## I. BACKGROUND

This case involves a group of individuals who contracted to purchase pre-construction condominiums. In 2005, Plaintiffs entered into purchase agreements (the "Purchase Agreements") with Harborage Cottages–Stuart, LLLP ("Harborage") to purchase condominiums in the Harborage Yacht Condominiums in Martin County, Florida (the "Harborage Condominiums"). Plaintiffs allege that Harborage made a number of misrepresentations in materials provided to the buyers, including the Harborage concept site plan, the Yacht Slip Membership Agreement, and marketing and promotional materials, as well as in verbal statements.

The alleged misrepresentations include that the Harborage Condominiums: (1) are a luxury development; (2) are extraordinary; (3) blend tropical charm with contemporary elegance; (4) combine materials and finishes of exceptional quality with timeless craftsmanship; (5) provide spacious patios from which to enjoy glorious sunrises over the water; (6) that Altman Development Corporation (the corporate parent of Harborage) consistently delivers products and services of the highest caliber to clients and residents; and (7) that no buildings or structures exist in the area to the South designated as the "Future Development" area.

Certain Plaintiffs also paid deposits to Northside Marina Venture, LLC ("Northside"), for Yacht Slip Membership in the Harborage Yacht Club & Marina, allegedly under the belief that they would be able to obtain an ownership interest in the dock slips at the marina and that such ownership could be held jointly without restrictions on use. In fact, no ownership interest in the dock slips was available. Harborage Yacht Club Yacht Slip Membership Agreement, Section V, ¶ 1 (dkt. # 86–4). Plaintiffs do not possess ownership in a dock slip but are merely entitled to use the dock slip while a member of the Harborage Yacht Club and Marina. Aff. of James Gentry, ¶ ¶ 12–14, sworn to January 22, 2009 (dkt. # 86–2); Aff. of Donald Hunt, ¶¶ 11–13, sworn to January 23, 2009 (dkt. # 94–2). Plaintiffs also contend that non-married joint members do not enjoy the same benefits as married joint members. *Id.*

Plaintiffs, alleging violations of federal and state law, brought an action to rescind the Purchase Agreements and recover their deposits because the Harborage Condominiums and facilities do not conform to representations relied on by the buyers upon entering into the Purchase Agreements.[1] Plaintiffs' claims originally included: (1) violations of the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1501 et seq.; (2) publication of false and misleading information under § 718.506, Florida Statutes; (3) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") under § 501.204(1), Florida Statutes; (4) breach of contract; (5) declaratory judgment; (6) negligent misrepresentation; and (7) fraudulent misrepresentation. Defendants moved to dismiss each of Plaintiffs' claims. In three separate Orders (dkt. #'s 25, 53 and 55) this Court dismissed the breach of contract and declaratory judgment claims. This Court also dismissed Plaintiffs R. Scott Stone, Jr. and Patricia Stone's (together, the "Stones") revocation claim under the ILSFDA. However, the Stones' claims for damages under § 1709 of the ILSFDA remains intact.

## II. STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554

(11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. ANALYSIS

### A. The ILSFDA

#### 1. Applicability of the ILSFDA

■■■ Harborage contends that it is exempt from the ILSFDA's requirements. The ILSFDA is "an antifraud statute utilizing disclosure as its primary tool with the principal purpose of protecting purchasers from unscrupulous sales of undeveloped home sites." *Kamel v. Kenco/The Oaks at Boca Raton LP*, No. 08–13692, ——

---

**1.** Plaintiffs filed two complaints which were consolidated.

Fed.Appx. ——, ——, 2008 WL 4601715, at *2 (11th Cir.2008) (per curiam) (internal quotation marks omitted). Section 1702 of the ILSFDA provides a number of exemptions, including an exemption which provides, in relevant part:

Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to—...

(2) the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years.

15 U.S.C. § 1702(a)(2). Although a sale of land where the seller is obligated to complete construction within two years is exempt from the ILSFDA, the seller's obligation to complete construction within two years may not be illusory.[2] *Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *2. "As a general rule, delay or nonperformance must be based on grounds cognizable in contract law such as impossibility or frustration and on events which are beyond the seller's reasonable control."[3] Guidelines for Exemptions Under the ILSFDA, 61 Fed. Reg. 13596, Part IV(b), ¶ 7 (hereinafter, "Guidelines"); *see also Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *2 (holding that purchase agreement provision was not illusory in light of requirement that construction be completed within two years, subject only to "delays caused by the Buyer or acts of God, the unavailability of materials, strikes, other labor problems, governmental orders, or other events which would support a defense based on impossibility of performance for reasons beyond the Seller's control").

It is clearly established that limitations on an obligation to complete construction may include circumstances that would support a defense of impossibility under Florida contract law. *Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *3. However, this conclusion is premised on the principle stated in the Department of Housing and Urban Development's ("HUD") Guidelines that limitations on a seller's obligation to complete construction "must be based on grounds cognizable in contract law such as impossibility or frustration and on events which are beyond the seller's reasonable control." Guidelines, 61 Fed. Reg. 13596, Part IV(b), ¶ 7. Thus, the guiding principle is that a limitation on the seller's obligation to complete construction must be cognizable as a defense recognized under state contract law. The examples given, including impossibility, frustration and events beyond the seller's reasonable control, are merely illustrative and are therefore non-exhaustive. Guidelines, 61 Fed. Reg. 13596, Part I, ¶ 2 ("Not every conceivable factor of the exemption process is covered in these Guidelines.... Examples are given, but the examples do not in any way exhaust the myriad possibilities ... nor do they set absolute standards."). Therefore, limitations in a purchase agreement concerning the seller's obligation to complete construction are not illusory where they are limited to defenses recognized under state contract law. *See Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *3 (holding that a seller's obligation was not illusory because the limitations were grounded in the doctrine of impossibility, which is a

---

2. "For a building to be considered complete, it must be physically habitable and usable for the purpose for which it was purchased." Guidelines, 61 Fed. Reg. 13596, Part IV(b), ¶ 2.

3. State contract law is applied when determining whether an obligation to complete construction is illusory. Guidelines, 61 Fed. Reg. 13596, Part IV(b), ¶ 6.

well-established defense under Florida contract law).

The Harborage Condominiums are comprised of 126 individual condominium units. Res. to Pl.'s Request for Admissions, # 5 (dkt. # 101–2). Of the 126 individual units, the Purchase Agreements for 36 units ("Purchase Agreement 1") obligated Harborage to complete construction within two years. Purchase Agreement 1, ¶ 7 (dkt. # 88–3). Purchase Agreement 1 provides, in relevant part:

Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than two (2) years following the date Buyer signs this Agreement, subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected.

*Id.* Here, the limitations on Harborage's obligation to complete construction are grounded exclusively in defenses cognizable under state contract law. Moreover, Purchase Agreement 1 does not require the buyer to waive any remedies, including specific performance or damages. *See Samara Dev. Corp. v. Marlow,* 556 So.2d 1097, 1101 (Fla.1990) (holding that in order for the seller to be obligated to complete construction, the purchase agreement must not limit the purchaser's right to seek specific performance or damages). Therefore, Harborage's obligation under Purchase Agreement 1 to complete construction is not illusory and the 36 individual units covered by Purchase Agreement 1 are exempt from the provisions of the ILSFDA.

The remaining 90 individual units were covered by a different purchase agreement ("Purchase Agreement 2"). These 90 units are also covered by one of the ILSFDA's exemption provisions, which provides:

Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions requiring registration and disclosure ... shall not apply to—...

(1) the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section.

15 U.S.C. § 1702(b). Accordingly, the ILSFDA's registration and disclosure provisions do not apply to the remaining 90 units. It is, however, important to note the difference between the exemptions enumerated in § 1702(a) and the exemptions found in § 1702(b). The exemption provisions in § 1702(a) create an exemption from the ILSFDA in its entirety, including the anti-fraud provisions found in § 1703(a)(2). The exemption provisions in § 1702(b), however, only create an exemption from the ILSFDA's registration and disclosure requirements. Therefore, the 36 individual units governed by Purchase Agreement 1 are exempt from all of the ILSFDA's requirements, and the remaining 90 units governed by Purchase Agreement 2 are exempt from the ILSFDA's registration and disclosure requirements, but not the anti-fraud provisions.

The question, however, remains as to whether the use of two separate Purchase Agreements, which largely exempt Harborage from the ILSFDA's requirements, constitutes a method of disposition that was adopted for the purpose of evading the ILSFDA's requirements. *See* 15 U.S.C. § 1702(a), (b). If a seller's method of disposition is adopted for the purpose of evading the ILSFDA's requirements, the seller is not entitled to any exemptions found in § 1702. This in turn raises the question of what constitutes evasion within the meaning of § 1702, the ILSFDA's exemption provision. As an initial matter, this Court finds that Harborage's use of

Purchase Agreements 1 and 2 constitute a method of disposition within the meaning of § 1702. The Guidelines provide some insight to the meaning of evasion, specifically in the context of § 1702(b)(1)'s exemption of the sale of lots in a subdivision containing fewer than 100 lots. The Guidelines provide, in relevant part:

> [A] developer of a subdivision containing a total of 129 lots ... qualifies for this exemption if at least 30 lots are sold in transactions that are exempt because the lots had completed homes erected on them. The 30 exempt transactions may fall within any one exemption or a combination of exemptions noted in [24 C.F.R.] § 1710.5(b) through (h) and may be either past or future sales. In the above example, the developer also could qualify if twelve lots had been sold with residential structures already erected on them, nine lots had been sold to building contractors and at least nine lots were reserved for either the construction of homes by the developer or for sales to building contractors. The reserved lots need not be specifically identified. Developers of subdivisions containing more than 99 lots who wish to operate under this exemption must assure themselves that all lots in excess of 99 have been and will be sold in transactions exempt under 24 CFR 1710.5(b) through (h).

Guidelines, Part V(a), ¶ 2–3.

While the examples provided in the Guidelines are intended to be illustrative and non-exhaustive, they nevertheless add substance to the meaning of evasion for ILSFDA purposes. It is clear from the examples provided in the Guidelines that a seller may take conscious action to ensure that a subdivision meets the requirements of an exemption. Stated another way, the mere fact that a developer structures the sales of a subdivision in a way that makes the project exempt from the ILSFDA is not, without more, sufficient to conclude that the seller has taken such action for the purpose of evading the ILSFDA's requirements. Nevertheless, given the language in § 1702(a) and (b) that renders the ILSFDA's exemptions inapplicable to a seller who utilizes a "method of disposition [that] is adopted for the purpose of evasion," there must be some quantum of action that falls within the meaning of evasion. Otherwise, the prohibition against evasion would be rendered superfluous.

Addressing the issue of evasion for ILSFDA purposes, the Eighth Circuit has held that a seller's actions only constitute evasion within the meaning of § 1702(a) and (b) if a seller's attempt to meet the requirements of one of the ILSFDA's exemptions is accompanied by fraudulent intent. *Atteberry v. Maumelle Co.*, 60 F.3d 415, 421 (8th Cir.1995). In other words, not only would a seller have to structure the lot sales to fall within one of more of the ILSFDA's exemptions, the seller would also have to engage in some associated fraudulent conduct, such as never actually intending to fulfill the associated construction obligations. *Id.* This approach evinces a certain degree of consistency with the examples in the Guidelines. If a seller may take affirmative action to avoid the obligations of the ILSFDA by ensuring that one or more of the exemptions apply, it is difficult to conclude that any quantum of intentional action taken to avoid the ILSFDA's requirements is sufficient to establish evasion within the meaning of § 1702, absent some additional extenuating circumstance such as fraud. The difficulty with this interpretation is that when drafting § 1702, Congress gave no indication that evasion should be construed as tantamount to fraud, nor are the two terms typically used synonymously. Nor do the Guidelines give any indication

that there must be fraud to trigger the evasion provision.

■ Moreover, the ILSFDA is a remedial statute intended to protect consumers from unscrupulous sales practices and requires ambiguities concerning exemptions to be construed narrowly.[4] *Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *2. A requirement that fraud must accompany evasion expands the scope of all exemptions in § 1702 because it substantially narrows the definition of evasion, thereby reducing the applicability of a principle that limits the scope of all ILSFDA exemptions. Therefore, a requirement that fraud must accompany evasion distorts the language of the statute and is in tension with its fundamental purpose.

■ It is nevertheless clear that Congress intended certain land sales to be exempt from the ILSFDA's requirements. It also seems clear, however, from the language proscribing a method of disposition adopted for the purpose of evasion, that a seller's ability to avail himself of the statute's exemptions must be tempered to ensure that the exemptions are not used in an abusive manner. Thus, an approach that maintains consistency with the text requires a sensible distinction to be drawn between conduct which has as its primary object avoidance of the ILSFDA's require-

ments and conduct that seeks to meet the requirements of an exemption for some legitimate business purpose. Otherwise, the protections Congress intended to afford to consumers purchasing undeveloped home sites could in many instances be circumvented merely by clever drafting that lacks any meaningful objective other than to sidestep the ILSFDA's requirements. Admittedly, the threshold for establishing a legitimate business purpose sufficient to qualify for an exemption may be low, but it requires some factual evidence demonstrating that the method of disposition has some bona fide, real world objective that manifests a legitimate business purpose. Furthermore, a seller may not rely on the absence of any evidence supporting a legitimate business purpose when confronted at the summary judgment stage with the contention that there is no material issue of fact concerning evasion on the part of the defendant. *See* Fed.R.Civ.P. 56(e)

The requirement that a seller act pursuant to a legitimate business purpose when seeking an exemption is also consonant with the examples provided in the Guidelines.[5] The examples offered in the Guidelines concerning the availability of exemptions provide scenarios where the availability of an exemption is driven by a

---

4. "Given the statute's remedial objective, when faced with an ambiguity regarding the scope of the [ILSFDA's] exemption[s], the court must interpret the exemption narrowly, in order to further the statute's purpose of consumer protection." *Pigott v. Sanibel Dev., LLC,* 576 F.Supp.2d 1258, 1268 (N.D.Ala. 2008) (quotation marks omitted).

5. The ILSFDA is ambiguous concerning the meaning of evasion for purposes of § 1702. "Where statutory language is ambiguous, we will defer to the interpretation of the government agency entrusted to administer the statute if it is based on a permissible construction of the statute." *Pugliese v. Pukka Dev., Inc.,* 550 F.3d 1299, 1304 (11th Cir.2008) (quoting

*Barnhart v. Walton,* 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984))) (internal quotation marks omitted). "*Chevron* deference applies to agency rules promulgated in the exercise of the authority to make rules carrying the force of law granted to the agency by Congress." *Pukka,* 550 F.3d at 1304 (citing *United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). HUD has authority to promulgate rules and regulations related to the ILSFDA. 15 U.S.C. §§ 1715, 1718.

legitimate business purpose. For example, with respect to the One Hundred Lot exemption in § 1702(b)(1), the Guidelines provide an example in which an exemption is available because of the presence of already completed homes on certain lots that met the requirements of § 1702(a)(2), leaving the remaining lots exempt under the One Hundred Lot exemption. Guidelines, 61 Fed. Reg. 13596, Part V(b), ¶ 1. The Guidelines provide another example where certain lots were exempt because they had preexisting residential structures already erected, while others lots were to be sold to contractors or reserved for construction of homes by the developer. The exemption of these lots qualified the remaining lots for the One Hundred Lot exemption. *Id.* at Part V(b), ¶ 2.

Each of these examples illustrate cases where the availability of an exemption is driven by a method of disposition that reflects a legitimate business purpose, as opposed to a method of disposition that lacks such a purpose and is adopted primarily to evade the ILSFDA's requirements. Therefore, requiring that the availability of an exemption be grounded in a legitimate business purpose is consistent with the language of the statute and the Guidelines, and strikes a workable balance that ensures the availability of the exemptions for their intended purpose while preventing their use in a manner that is abusive and unnecessarily diminishes consumer protection from unscrupulous sales practices.

■ Here, Harborage seeks to avail itself of the exemption provision in § 1702(a)(2), involving the sale of lots where the seller is obligated to complete construction within two years, as well as the exemption provision in § 1702(b)(1), applicable to subdivisions container fewer than 100 lots. If permitted to utilize both exemptions, Harborage would only be re-

quired to have complied with the antifraud provisions of § 1703(a)(2) for the 90 lots not exempt under § 1702(a)(2). As explained above, Harborage's basis for qualifying for the former exemption is that 36 of 126 Purchase Agreements obligated the seller to complete construction within two years. The other 90 contained no such provision. Harborage's basis for qualifying for the latter exemption is that once the 36 units are deducted from the total, the 90 remaining units meet the One Hundred Lot exemption in § 1702(b)(1). It is not inconceivable that there could be some legitimate business reason for the differences. However, there is no such evidence in the record. Moreover, viewing the Purchase Agreements side by side, no legitimate business purpose is evident.

■ On the contrary, it appears that separate Purchase Agreements were used primarily to avoid compliance with the ILSFDA's requirements. This conclusion is warranted because Harborage has failed to put forth any reason why Purchase Agreement 1 required construction to be completed within two years whereas Purchase Agreement 2 had no such requirement. Nor has any evidence been presented as to why Purchase Agreement 1 was used in 36 instances, enough to qualify the remaining 90 units for the 99 units or less exemption. Additionally, it is evident from the manner in which the Purchase Agreements are drafted that they were meant to be used in conjunction so as to avoid the ILSFDA's requirements. For example, the exemption in § 1702(a)(2) requires that the seller's obligation to complete construction within two years is not illusory. *Kamel,* —— Fed.Appx. at ——, 2008 WL 4601715, at *2. The seller's obligation to complete construction will be deemed illusory if a purchase agreement denies the buyer basic contractual remedies such as specific performance. *Sa-*

*mara Dev. Corp.*, 556 So.2d at 1101. Purchase Agreement 1, which is exempt under § 1702(a)(2), contains no language in its default provision that denies the buyer the opportunity to seek specific performance as a remedy. Purchase Agreement 1, § 13.

On the other hand, Harborage seeks to exempt Purchase Agreement 2 pursuant to § 1702(b)(1), which has no associated requirement concerning the buyer's ability to bring a specific performance claim. The default provision in Purchase Agreement 2, however, which is otherwise virtually identical to the default provision in Purchase Agreement 1, provides that "[b]uyer shall not be permitted to seek specific performance of [s]eller's obligations under the Agreement," "absent an intentional or wilful default." Purchase Agreement 2, § 13. Harborage's inclusion of a provision waiving the buyer's ability to seek specific performance when it does not affect a seller's ability to qualify for an ILSFDA exemption, while excluding the provision when it prevents Harborage from qualifying for an exception, is strong evidence that the drafting of the Purchase Agreements, and the quantitatively advantageous use of each, have been for the primary purpose of evading the ILSFDA's requirements, and not for any legitimate business purpose.

It is further evident that the Purchase Agreements were drafted with the ILSFDA's exemption provisions in mind because the default provision in Purchase Agreement 1 seeks to ensure compliance with § 1702(a)(2) by stating that "[s]eller shall not be entitled to the curative period described above" if such period "would not be permitted if the exemption of this sale from the [ILSFDA] act pursuant to 15 U.S.C. § 1702(a)(2) is to apply." This language, which attempts to ensure that Purchase Agreement 1 qualifies for a specific ILSFDA exemption, demonstrates that the interplay between the Purchase Agreements is not merely coincidental, but is intended to evade the ILSFDA's obligations and has no legitimate business purpose.

Given the lack of binding precedent within this Circuit and the sparse treatment by federal courts concerning the definition of evasion for purposes of the ILSFDA's exemption provision, the Parties were undoubtedly on unsure footing concerning the definition of evasion that this Court would apply. Nevertheless, both sides were aware that the meaning of evasion for purposes of the ILSFDA's exemption provision was relevant and briefed the issue accordingly. Given the uncertain state of the law, all Parties were required to marshal facts in the record to support their respective positions. In doing so, it was not necessary to know the particular meaning of evasion in this context because the ILSFDA's language provides sufficient direction to permit the Parties to articulate concrete factual arguments supported by the record. Whether this Court chose to apply the Eighth Circuit's fraud based standard or formulated another approach, the Parties' factual arguments would have been sufficient to determine whether Harborage's selling methods evaded the ILSFDA's requirements, thereby making them ineligible for any of its exemptions.

Notwithstanding, Harborage has put forth no factual evidence as to why its conduct does not constitute evasion within the meaning of the ILSFDA. While Harborage has put forth legal arguments as to why no evasion occurred here, these arguments are only valid insofar as this Court's interpretation of the ILSFDA is consistent with Harborage's legal analysis. To the extent that this Court's statutory interpretation differs from Harborage's, this Court must look to the facts to ascertain whether

Harborage has evaded the ILSFDA's requirements for purposes of § 1702. Harborage has not pointed to any factual evidence as to why no evasion occurred here, nor has this Court been able to identify any in the record. Therefore, Harborage evaded the ILSFDA's requirements for purposes of § 1702 and is not entitled to any exemptions found in § 1702(a) or (b).

2. The ILSFDA's Statute of Limitations

 Defendants assert that Plaintiffs James D. Gentry ("Gentry") and Donald J. Hunt's ("Hunt") ILSFDA claims are time barred. Sections 1703(c) and (d) require a purchaser to demand revocation within two years of the date the purchaser signs a purchase agreement. Section 1703(c) states:

In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or the lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).

Furthermore, under the ILSFDA, any contract in which the seller does not provide (1) a description of the property which makes such lot clearly identifiable in a form acceptable for recording, (2) a means for curing buyer default, and (3) procedures for handling seller default, "may be revoked at the option of the purchaser or lessee for up to two years from the date of the signing of such contract or agreement." 15 U.S.C. § 1703(d). The ILSFDA also provides a statute of limitations within which a purchaser may bring an action to enforce rights provided under various sections of the ILSFDA. With respect to the right to revoke provided in 15 U.S.C. § 1703(c) and (d), a purchaser may bring a revocation claim within three years of the date of signing a purchase agreement. 15 U.S.C. § 1711(b).

Gentry and Hunt allege, among other things, that Harborage failed to furnish a property report in advance of signing the Purchase Agreement and that the Purchase Agreement did not inform them of their right to revoke the contract within two years. Gentry and Hunt Compl., ¶ 37–41 (dkt. # 1). Gentry and Hunt jointly signed the Purchase Agreement on February 14, 2005. Gentry and Hunt Compl., Ex. A. In a letter dated January 11, 2008, Gentry and Hunt notified Defendants that they were seeking to revoke the Purchase Agreement. Gentry and Hunt Compl., Ex. E. Gentry and Hunt filed a complaint against Defendants on January 17, 2008. Compl., (dkt. # 1). The letter seeking revocation does not fall within the two-year time period from the date that Gentry and Hunt signed the Purchase Agreement. Defendants contends that the ILSFDA claim is time barred because Gentry and Hunt failed to revoke the Purchase Agreement within two years of signing it and because they failed to bring their revocation claim within three years of signing the Purchase Agreement.

Harborage's failure to provide notice to Plaintiff of his right to revoke within two years does not excuse non-exercise of that right within the statutory two-year period. "[N]othing in the ILSFDA states that failure to disclose the right to rescind in the purchase agreement obviates, tolls or extends the two year deadline for rescission." *Taylor v. Holiday Isle, LLC*, 561 F.Supp.2d 1269, 1274–75 (S.D.Ala.2008). "Nothing in the statute says that the two-year period prescribed by § 1703(c) runs from the date that purchasers discovered or should have discovered they had a right

to rescind." *Id.*; *Pugliese v. Pukka Dev., Inc.*, 524 F.Supp.2d 1370, 1372 (S.D.Fla. 2007) (stating that the requirements of 15 U.S.C. § 1703(d) are not mandatory and that "[t]he seller instead is given an incentive: should the seller choose to exclude it, the buyer is permitted to revoke the purchase contract for up to two years after its signing").

The ILSFDA confers upon purchaser the right "to bring any action at law or in equity against the seller . . . to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title." 15 U.S.C. § 1709(b). "Thus, § 1709(b) would plainly allow a purchaser to bring a claim for damages based on seller's failure to provide the statutorily required notice of rescission." *Taylor*, 561 F.Supp.2d at 1276. It would be improper to read into the statute an additional remedy for a seller's violation of the § 1703(c) and (d) notice requirements. Therefore, Gentry and Hunt's ILSFDA revocation claim is dismissed for failure to revoke the purchase agreement within the two-year statutory period. However, Gentry and Hunt's Complaint was filed within three years of signing the Purchase Agreement. Therefore, their claim for damages under 15 U.S.C. § 1709(d) is not barred by the statute of limitations.

3. The ILSFDA's Anti–Fraud Provisions

 Plaintiffs assert that Harborage violated the ILSFDA's anti-fraud provisions by making material misrepresentations upon which Plaintiffs relied when entering into the Purchase Agreements. The ILSFDA's anti-fraud provisions state, in relevant part:

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—. . .

(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title-

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision.

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser . . . .

15 U.S.C. § 1703(a)(2). Statements that are mere opinions or exaggerations concerning the qualities of an offering by a seller constitute non-actionable puffery. *In re Managed Care Litig.*, 150 F.Supp.2d 1330, 1346 (S.D.Fla.2001) citing *United States v. Simon*, 839 F.2d 1461, 1468 (11th Cir.1988) (citing *United States v. New South Farm & Home*, 241 U.S. 64, 71, 36 S.Ct. 505, 60 L.Ed. 890 (1916)). However, a seller whose statement goes beyond exaggeration and assigns an offering a specific quality that it does not possess has "transcended the limits of puffery and engaged in false representations." *Id.*

 Here, the statements that the Harborage Condominiums (1) are a luxury development; (2) are extraordinary; (3) blend tropical charm with contemporary elegance; (4) combine materials and finishes of exceptional quality with timeless craftsmanship; (5) provide spacious patios from which to enjoy glorious sunrises over the water; and (6) that Altman Develop-

ment Corporation consistently delivers products and service of the highest caliber to clients and residents, fall squarely within the scope of opinions, exaggerations and general characterizations that constitute puffery. None of these statements attribute a sufficiently specific quality to the Harborage Condominiums to constitute an untrue statement of material fact or an omission to state a material fact. Plaintiffs' allegations concerning materials used to finish the interiors and the overall architectural configuration are precluded by the plain language of Sections 14–15 of the Purchase Agreements.

 Plaintiffs also allege that they were misled by a map or concept site plan that was located in the sales office. The map or concept site plan (dkt. # 94–4) shows an aerial view of the Harborage Condominium buildings and surrounding area. The concept site plan depicts a series of buildings running in single file approximately North to South, abutted by NW Flagler Avenue to the West and by water to the East. At the southern most end is one of the Harborage Condominium Buildings, called the St. Martin Building. To the South of the St. Martin Building is an area that, on the concept site plan, appears to be a lot or open area which is labeled "Future Development." Plaintiffs contend that they understood from the concept site plan that the area labeled "Future Development" was to be an undeveloped area with no structures on it that might be used at some point to construct a dry storage facility. Dep. of Gentry, at 35–36. In fact, although not shown on the concept site plan, the area labeled "Future Development" has two buildings in it. Dep. of John Goodfellow, at 23 (dkt. # 87–2). One of these buildings is a large corrugated steel structure used as a service yard building. Id. The other building is occupied by High Seas Fabrication, Inc.

("High Seas"), which manufactures towers for boats. Id. One of these buildings has "a paint shop inside and a louvered exhaust fan which spews paint and fumes and other material," and is "located directly underneath unit 307 of the [St. Martin Building]." Aff. of Hunt, ¶ 6.

Harborage's use of the concept site plan and its depiction of the "Future Development" area constitutes an untrue statement of material fact and an omission to state a material fact. The concept site plan erroneously represents the "Future Development" area in a way that would lead a reasonable buyer to conclude that the area was an open and undeveloped area or would be open and undeveloped once construction was completed. The concept site plan depicts the Harborage Condominium area in substantial detail, including roadways, building shapes, roof contour lines, parking areas, landscaping, and boat slips. While the concept site plan by its very nature is a projection based on anticipated construction, one purpose for which it was used was to provide buyers with a visual depiction of what the area would look like after construction was completed. Dep. of Goodfellow, at 36. Harborage could have made some changes to the concept site plan during the course of construction. However, to the extent that the concept site plan was used as a marketing tool, the concept site plan's depiction of the "Future Development" area made a material representation concerning the development area, and omitted to depict a material component necessary to make the concept site plan not misleading.

The concept site plan did not depict what was actually at the "Future Development" area at the time of the sales. It did not depict what the area was anticipated to look like when construction of the condominiums was completed, nor did it depict Harborage's final plans for the area. Har-

borage's original intent for the "Future Development" area was to remove the existing structures and build a dry storage facility for 88 boats, with residential units above it. Dep. of Goodfellow, at 26–30. In December of 2004, Harborage knew that it was highly unlikely that the dry storage facility would be completed by the time the condominiums were finished because of the unpredictability of obtaining the necessary permits and because High Seas had a lease on one of the buildings that was effective through January of 2009. *Id.* at 27–29, 78–80. Yet instead of depicting the area as it was expected to be at the time that condominium construction was completed, or depicting the planned dry storage facility, Harborage essentially removed all pertinent information from this part of the map and labeled the area "Future Development." Undoubtedly, there may have been meaningful reasons for doing so, particularly since a corrugated steel building and a building housing an industrial manufacturing business immediately adjacent to a high-end condominium might have caused certain buyers to reconsider the sagacity of the purchase.

A reasonable buyer visiting the location would have had difficulty ascertaining that there were structures on the "Future Development" area or that those structures would be immediately adjacent to the St. Martin Building. Harborage's on-site temporary sales center was located towards the opposite end of the development area, on or near the footprint of the Westport building. *See* Concept Site Plan (dkt. # 92–3). This sales center was a significant distance from the "Future Development" area and was situated on the opposite side of the Roosevelt Bridge, which intersects the development area. Even if

Harborage made efforts to place markers or other survey type devices to give potential buyers a sense of orientation within the development area, a reasonable buyer could not have been expected to ascertain the meaning of such devices and accurately correlate them to the concept site plan. Therefore, even though the buildings on the "Future Development" area may have been visible, it would have been difficult if not impossible for a person to determine that those buildings were actually within the "Future Development" area as depicted in the concept site plan, or to determine what the proximity would be from those buildings to the future location of the St. Martin building. Furthermore, although Harborage's sales agents [6] were told that a dry storage facility would eventually be constructed in the "Future Development" area, the sales agents were not instructed to provide this information to potential buyers unless asked, nor is there evidence that this information was contained in any marketing materials. Dep. of Goodfellow, at 31–32.

Under these circumstances, one of the primary reasons the concept site plan was misleading was because it depicted the condominium development area in a completed state, thus giving a buyer an expectation as to what the area would look like once was construction was completed. Harborage knew, however, that it was extremely likely that the pre-existing buildings in the "Future Development" area would still be there once construction was completed. Dep. of Goodfellow, at 27–29. Thus, while the concept site plan provided an illustration of the area at the completion of construction, the "Future Development" area provided an illustration for a point in time even farther in the future,

---

**6.** Harborage worked with Premier Sales Group to facilitate sales. *See* Dep. of Goodfellow, at 78. The units were sold out within a few hours once sales commenced. Dep. of Goodfellow, at 31–32.

after the buildings on the "Future Development" area had been removed and prior to construction of the dry storage facility. This anachronistic depiction of the "Future Development" area was deceptive because Harborage knew that the dry storage facility would probably not be completed by the time the condominium construction was finished and that the existing buildings would still be in place. Dep. of Goodman, at 27–29, 78–80.

The effect was that a reasonable buyer visiting the site and looking at the concept site plan would conclude either that the "Future Development" area was undeveloped and that the corrugated steel building and High Seas building were actually farther to the South, or that the buildings on the "Future Development" area would no longer be there once construction was completed. In light of the fact that Harborage knew that it was highly likely that the buildings on the "Future Development" area would still be there once construction of the condominiums was completed, Harborage concealed material information and omitted material information that would have made the concept site plan not misleading. Even if Plaintiffs knew of Harborage's intent to build a dry storage facility, the concept site plan depicted the absence of any structure on the "Future Development" area in a way that would lead a reasonable person to conclude that the area would be vacant once construction was completed. Therefore, there is no issue of material fact as to whether Harborage breached the ILSFDA's anti-fraud provision concerning material misrepresentations and omissions.

It is of no moment that the Purchase Agreements contain a provision that insulates Harborage from liability related to nearby activities and views, including noise, commotion, nearby construction, demolition, and interference with views. Purchase Agreements, § 30. The Purchase Agreements also provide that "because of the proximity of the Condominium Property to an active railroad, vibration and/or noise from the railroad (and the trains on the railroad tracks) may be detectable and create a nuisance." *Id.* This Court's finding concerning Harborage's misrepresentation and omission is not incompatible with the Parties' rights and obligations pursuant to the aforementioned provision. By way of analogy, had Harborage, knowing that a railroad running parallel to the condominiums was likely to create a nuisance, deleted the railroad from the concept site plan and replaced it with a blank area denoted as "Future Development" area, this would have constituted a material misrepresentation and omission, without respect to the terms of the Purchase Agreement. Therefore, this Court's finding that Harborage violated the ILSFDA's anti-fraud provision is not impacted by the Purchase Agreements' provision concerning nearby activities and views.

Although the misrepresentation and omission concerning the "Future Development" site applies to all Plaintiffs, the damages recoverable depend on a particular unit's proximity to the "Future Development" area, as well as the degree to which its presence is a detriment to the development as a whole. There is insufficient evidence in the record to ascertain the amount of damages to which Plaintiffs are entitled. Accordingly, there an issue of material fact concerning the amount of damages that Plaintiffs may recover.

### 4. The ILSFDA's Registration and Disclosure Requirements

Plaintiffs also contend that Harborage has violated the ILSFDA's registrations and disclosure requirements. *See* 15

U.S.C. §§ 1703(a)(1), 1704–1707. Specifically, Plaintiffs allege that Harborage (1) had no statement of record in effect pursuant to §§ 1703(a)(1)(a), 1704(a) and 1706(a); and (2) failed to provide buyers with a printed property report pursuant to §§ 1703(a)(1)(b) and 1707. Harborage admits that these allegations are true.[7] *See* Def.'s Res. to Pl.'s Request for Admissions, (dkt. # 's 6–7). Therefore, Harborage has violated the ILSFDA's registration and disclosure requirements and Plaintiffs are entitled to damages under 15 U.S.C. § 1709.

In determining damages, the following factors may be considered: (1) the contract price of the unit; (2) the amount the buyer actually paid; (3) the cost of any improvements; (4) the fair market value at the time relief is determined; and (5) the fair market value of the unit at the time the unit was purchased. 15 U.S.C. § 1709(a). The amount recoverable may include "interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot." 15 U.S.C. § 1709(c). There is insufficient information in the record concerning the amount of damages to which Plaintiffs are entitled. Accordingly, there is a material issue of fact as to the amount of damages Plaintiffs may recover.

### B. FDUTPA Claims

#### 1. Harborage

■■■ Plaintiffs also assert that Harborage and Northside violated the FDUTPA based on the aforementioned misrepresentations concerning the Harborage Condominiums and the Harborage Yacht Club boat slips. Section 501.204(1), Florida Statutes, states:

> Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

§ 501.204(1), Fla. Stat. The elements for a FDUTPA claim are: "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F.Supp.2d 1314, 1326 (M.D.Fla.2007). Although the FDUTPA does not define "deception" or "unfair practice," the Florida Supreme Court and the Eleventh Circuit have stated that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Scott v. Capital One Bank*, 08:cv–132–T–30EAJ (JSM), 2008 WL 2157037, at *2 (M.D.Fla.2008) (citing *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir.2007).)

■■■ "Because the [ILSFDA] generally proscribes certain unfair and deceptive trade practices, a violation of the [ILSFDA] is a violation of the FDUTPA as well." *Trotta v. Lighthouse Point Land Co., LLC*, 551 F.Supp.2d 1359, 1367 (S.D.Fla.2008), *rev'd on other grounds*, *Pugliese v. Pukka Dev., Inc.*, 550 F.3d 1299 (11th Cir.2008) (citation omitted). Therefore, Harborage's violation of the ILSFDA's anti-fraud provision also constitutes a violation of the FDUTPA.[8] There

---

7. This Court finds that Defendants' Responses to Plaintiffs' Request for Admissions was timely.

8. In the Hunt and Gentry Complaint (dkt. # 1 Case No. 08–14020) the FDUTPA claim is brought against Northside (Count V). In the Stones' Complaint (dkt. # 1 Case No. 08–

14179), the FDUTPA claim is brought against Harborage (Count III). However, the absence of a legal theory in a pleading is not fatal, as long as the facts alleged support a viable cause of action. Under the Federal Rules of Civil Procedure, a plaintiff need not provide notice in the complaint of a legal theory supporting a claim. *See Int'l Mktg.,*

remains, however, an issue of material fact concerning the damages to which Plaintiffs are entitled. *See* § 501.2075, Fla. Stat, (containing the FDUTPA's civil penalty provision).

### 2. Northside

■ Gentry and Hunt also bring an FDUTPA claim against Northside. Gentry and Hunt allege that Northside represented that the dock slips were available for purchase when in fact they were only available for use by members of the Harborage Yacht Club and Marina and that they would not have entered into a membership agreement absent this belief. The Harborage Yacht Club Yacht Slip Membership Agreement (the "Membership Agreement") (dkt. # 86–4) states, in relevant part:

> Membership in the Club is not an investment in the Company ... and does not give a member a vested or prescriptive right or easement to use the Club Facilities. Membership in the Club does not provide a member with an equity or ownership or any other property interest in the Company or Club Facilities. A member only acquires a revocable license to use the Club Facilities.

The terms concerning access to the Harborage Yacht Club are clear and unambiguous and provide sufficient notice that no ownership rights were being conveyed. Less clear is a marketing document relating to the Harborage Yacht Club, which states "[s]ocial memberships and boat slips are now available for purchase." (dkt. # 87–12). This document, however, is insufficient to prevail on an FDUTPA claim, particularly in light of the clear language of the Membership Agreement. Although the marketing materials distributed suggested that dock slip ownership was available, the terms of the Membership Agreement were sufficient to dispel any uncertainty concerning the rights and obligations flowing from it. The Membership Agreement contained provisions that expressly and directly clarified the rights conveyed and left no room for ambiguity concerning the information in the marketing materials. Therefore, there is no issue of material fact as to whether Northside utilized any unfair, unconscionable or deceptive trade practice. Furthermore, although there may be disagreement as to how Gentry and Hunt, as co-owners, may or may not use the facility, this dispute does not rise to the level of cognizable claim under the FDUTPA.

### C. Publication of False and Misleading Information

■ Plaintiffs also contend that Defendants violated § 718.506, Florida Statutes, by publishing false and misleading information. Section 718.506, states, in relevant part:

> Any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall

---

*Ltd. v. Archer–Daniels–Midland Co., Inc.,* 192 F.3d 724, 733 (7th Cir.1999) ("The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process."); *Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir.1992) ("Although it is common to draft complaints with multiple counts, each of which specifies a single statute or legal rule, nothing in the Rules of Civil Procedure requires it."). Therefore, Gentry and Hunt's FDUTPA claim is cognizable against Harborage.

have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

§ 718.506(1), Fla. Stat. " '[R]eliance on fraudulent misrepresentations is unreasonable *as a matter of law* where the alleged misrepresentations contradict the express terms of the ensuing written agreement.' " *Garcia v. Santa Maria Resort, Inc.,* 528 F.Supp.2d 1283, 1295 (S.D.Fla.2007) (emphasis in original) (quoting *Eclipse Med., Inc. v. Am. Hydro–Surgical Instruments, Inc.,* 262 F.Supp.2d 1334, 1342 (S.D.Fla. 1999)); *Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1428 (S.D.Fla.1996); *Acquisition Corp. of Am. v. FDIC,* 760 F.Supp. 1558, 1561 n. 6 (S.D.Fla.1991). "[A] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract." *Garcia,* 528 F.Supp.2d at 1295 (quoting *Rosa v. Amoco Oil Co.,* 262 F.Supp.2d 1364, 1368–69 (S.D.Fla.2003)). Here, the Purchase Agreements contain a provision which states, in relevant part:

> This Agreement contains the entire understanding between Buyer and Seller. Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer agrees that Buyer has not relied on them.

Purchase Agreements, ¶ 39. The Purchase Agreements also state that "[n]othing herein shall be deemed to deny or abridge the rights granted under Section 718.506, Florida Statutes." Purchase Agreements, ¶ 14. To the extent that any alleged misrepresentations were oral statements, Plaintiffs cannot have reasonably relied on them given the terms of the Purchase Agreements precluding reliance on oral representations. *See* Purchase Agreements, pg. 1 (first unnumbered paragraph), and ¶ 39; *Garcia,* 528 F.Supp.2d at 1295. Furthermore, Plaintiffs allegations concerning misrepresentations which this Court has concluded are puffery are not actionable here.

 For the reasons stated in Section III(A)(3) of this Order, Harborage's representations of the "Future Development" area constitute the publication of false and misleading information for purposes of § 718.506. *See Klinger v. Zaremba Florida Co.,* 502 So.2d 1252, 1254 (Fla. 3d DCA 1986) (stating that although developers did not have to complete final phases of construction, if construction was completed, elimination of the jogging path and outdoor track around a lake would be a substantial deviation from developer's representations); *Aaronson v. Susi,* 296 So.2d 508 (Fla. 3d DCA 1974) (finding that conversion of a planned recreational area into an additional apartment was a substantial deviation from developer's initial representation). There are no terms in the Purchase Agreement that expressly contradict Harborage's misrepresentation and omission concerning the "Future Development" area. Absent a term in the Purchase Agreement establishing specific rights and obligations concerning the use of the "Future Development" area, the Purchase Agreements fail to dispel the concept site plan's misrepresentation and omission. Therefore, Harborage violated § 718.506 by publishing false and misleading information that was used in advertising and promotional material. There is, however, an issue of material fact concerning the damages to which Plaintiffs are entitled. For the reasons stated in Section III(B)(2) of this Order, Northside has not violated § 718.506.

### D. Negligent and Fraudulent Misrepresentation

 Plaintiffs also allege that Northside engaged in negligent and fraudulent misrepresentation. "To state a cause of action for negligent misrepresentation, a plaintiff must allege that: (1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making that statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely ... on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation." *Romo v. Amedex Ins. Co.*, 930 So.2d 643, 653 (Fla. 3d DCA 2006); *see Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985). "To state a cause of action for fraudulent misrepresentation, a plaintiff is required to allege ... (1) a misrepresentation of a material fact; (2) which the person making the statement knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied on the misrepresentation to his detriment, and (5) that this reliance caused damages." *Romo v. Amedex Ins. Co.*, 930 So.2d 643, 653 (Fla. 3d DCA 2006). For the reasons stated in Section III(B)(2) of this Order, there is no issue of material fact as to whether Northside engaged in negligent or fraudulent misrepresentation. Accordingly, Northside is entitled to summary judgment on these claims.

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (dkt. # 85) is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED with respect to Plaintiffs' ILSFDA claim for revocation. The motion is DENIED as to all other counts against Harborage. The motion is GRANTED as to all counts against Northside. It is further

ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to Plaintiffs' ILSFDA claims for damages under § 1709, inasmuch as Plaintiffs prevail on the liability portion of the claims that Harborage violated the ILSFDA's anti-fraud provision and registration and disclosure requirements. The motion is DENIED as to Gentry and Hunt's ILSFDA claim for revocation. The motion is DENIED with respect to the issue of damages on all ILSFDA claims. The motion is GRANTED with respect to the liability portion of all FDUTPA claims against Harborage, DENIED as to corresponding damages, and DENIED as to all FDUTPA claims against Northside. The motion is GRANTED with respect to the liability portion of all claims against Harborage under § 718.506, Florida Statutes, DENIED as to corresponding damages and rescission, and DENIED with respect to all such claims against Northside. The motion is DENIED with respect to all claims of negligent and fraudulent misrepresentation against Northside.[9]

---

9. The issue of how Harborage's violations affect the Parties' rights and obligations under the Harborage Yacht Club Yacht Slip Membership Agreement remains unresolved and may be considered during the course of ascertaining damages.